Filed 7/5/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S189856 |
| v. | ) | |
| | ) | Ct.App. 4/1 D055698 |
| PERLA ISABEL GONZALEZ, | ) | |
| | ) | San Bernardino County |
| Defendant and Appellant. | ) | Super. Ct. No. FVA024527 |
| _____ | ) | |

Defendant Perla Isabel Gonzalez (Perla) recruited her brother and her boyfriend to assault Roberto Canas-Fuentes (Canas).[1]  After Canas fended off a knife attack and gained the upper hand in the fight, Perla handed the boyfriend a loaded rifle.  Canas wrested the rifle away and shot the boyfriend dead.  The jury convicted Perla of the attempted premeditated and deliberate murder of Canas and, based on the provocative act doctrine, the first degree murder of her boyfriend.[2]

We recently held that similar circumstances could support a conviction of first degree murder if the defendant personally acted willfully, deliberately, and

---

[1]  We refer to members of the Gonzalez family by their first names to avoid confusion.  Consistent with the parties' briefing and the Court of Appeal decision, we have shortened Mr. Canas-Fuentes's name.

[2]  The provocative act doctrine does not define a crime.  (*People v. Cervantes* (2001) 26 Cal.4th 860, 867, fn. 10 (*Cervantes*).)  Rather, "provocative act murder" is a descriptive term referring to a subset of intervening-act homicides in which the defendant's conduct provokes an intermediary's violent response that causes someone's death.  (*Id*. at p. 872, fn. 15.)

1

with premeditation during an attempted murder. (*People v. Concha* (2009) 47 Cal.4th 653, 658 (*Concha*).) Here, substantial evidence supports Perla's conviction for the murder of her boyfriend. As in *Concha*, the trial court erred in instructing the jury on the requirements for premeditated and deliberate first degree murder; however, we conclude the error was harmless beyond a reasonable doubt.

## BACKGROUND

Joan Curiel and her husband, Canas, had a three-year-old daughter together. When they separated, Curiel moved into the residence of Ricardo Gonzalez (Ricardo). Ricardo is defendant Perla's brother. Curiel's two other children and her mother, Rosalba Osguera-Alvarez (Osguera), also moved into Ricardo's home. The relationship between Canas and Ricardo was volatile. The two men had argued several times on the telephone and had fought physically at least once. Canas and Curiel shared custody of their daughter, but Canas typically picked up the child away from Curiel's residence in order to avoid encountering Ricardo.

Canas worked as an emergency room technician. On the evening of May 21, 2005, Curiel called Canas, arranging to bring her mother to the hospital for treatment. After Osguera returned home, Curiel and Ricardo began arguing about whether Curiel had lied to him about "partying" with Canas while Ricardo was in Mexico. During the argument, Canas called and spoke to Curiel. According to Ricardo, Canas bragged that he and Curiel had been intimate while Ricardo was away. Canas understood Curiel to say she did not want Ricardo in the home, and Canas could hear children screaming in the background. Concerned for his daughter, Canas drove to the residence and arrived just as Curiel was driving away with the children. Canas yelled at Ricardo, but Ricardo ignored him and went after Curiel in his own car. Canas followed. He drove between their two vehicles, blocking Ricardo's progress, and yelled at him, "What . . . are you thinking? The kids are in the car. Knock it off." Ricardo drove away in the opposite direction,

and Canas followed to make sure Ricardo did not resume his pursuit of Curiel and the children.

Later that evening, after Ricardo and Curiel had both returned home, several members of Ricardo's family gathered to discuss the altercation. In addition to Ricardo and Curiel, the group included Ricardo's mother and grandmother; his brother Jorge and Jorge's girlfriend; his sister Perla and Perla's boyfriend, Fernando Morales. Perla, the defendant here, said that if anything happened to Ricardo, the family would "kick [Canas's] ass." Meanwhile, Canas continued to call the house and argue with Ricardo. Finally, Jorge answered the telephone and agreed to fight Canas at a nearby street corner. Jorge waited at the corner with his girlfriend, Perla, and Morales, the ultimate decedent. Morales had brought a BB gun and shot it out the car window to pass the time. They waited for 15 or 20 minutes then left when Canas did not arrive.

The next morning, Perla picked up Jorge at his house and told him they were going back to the street corner to "beat up" Canas. Curiel had told Perla that Canas would be picking up his daughter at the corner, and Perla wanted to intercept him there. Jorge brought a baseball bat, with which he planned to break the windows of Canas's car. When Jorge got in Perla's car, he saw a light brown rifle lying in the backseat area. Perla then drove back to her house to pick up her boyfriend, Morales. Jorge told Morales about the plan to assault Canas, and Morales agreed to help if Canas got the upper hand. After a brief stop at Ricardo's house to confirm that Canas had not yet picked up his daughter, the group drove to the intersection where they had waited for Canas the night before. They eventually decided to leave, but Perla's car would not start. Jorge ran back to Ricardo's house for help, leaving Perla and Morales waiting at the car. On the way, Jorge passed Osguera walking Canas's daughter to the corner to meet her father. Curiel's 13-year-old daughter walked behind them. When she joined them at the corner, she saw Perla and Morales standing next to a car with the hood

3

raised.  Perla approached Osguera and told her to leave, but the grandmother refused.

After about 10 minutes, Canas arrived.  He noticed Perla and Morales standing next to a car with the hood up.  He had never seen them before and did not know them.  As a result, he had no reason to expect any difficulty.  When Canas opened his car door and beckoned for his daughter, Osguera hastily approached and told Canas to leave.  Morales walked up to the car at the same time and said, "Hey, *puto*, I heard you had a problem."  When he realized Morales was not joking, Canas told Osguera to put his daughter in his car and leave.  As she did so, Morales began punching Canas.

Canas fought back.  Morales then pulled a knife with a three- to four-inch blade from his waistband and lunged at Canas, stabbing him in the face.  Perla stood about 10 feet away, near the rear of her car, watching the fight.  When Morales advanced on him again, Canas ducked and grabbed Morales's legs from under him, hurling him onto his back.  Morales quickly rose and ran toward Perla's car.  Canas saw Perla reach inside the car and grab a rifle.  She met Morales near the back of the car, "cocked" the rifle by pulling back the hammer, then handed it to Morales.[3]

Seeing this, Canas ran at Morales, who had his back turned.  During the ensuing struggle, the rifle discharged several times.  Canas was hit in the hand, bicep, and thigh but managed to gain control of the rifle.  Perla ran away.[4] Morales also turned to run.  Afraid for his life, Canas fired the rifle in Morales's

---

[3]     As Osguera was preparing to drive off with Canas's daughter, she saw Perla pull from her car what looked like a long stick.  She testified that she realized it was a firearm when Perla began shooting at Canas.  The jury apparently rejected this testimony.  No other witness, including Canas, testified that Perla fired the weapon, and the jury found not true an allegation that Perla discharged a firearm during the attack on Canas.

[4]     Although the trial testimony indicates Perla ran after handing the rifle to Morales, it is unclear how far away she was when the lethal shots were fired.

direction at least three times, until it ran out of ammunition. Morales fell to the sidewalk. Canas went to Morales and, after ensuring he was unarmed, checked his pulse. Canas still did not know his assailants or why they had attacked him.

Curiel drove to the scene and found Canas sitting on the sidewalk near Morales's body. When she asked what had happened, a shaken Canas yelled, "He shot me, so I shot him back." Curiel began driving home but soon returned to the scene with Jorge and Perla. Perla screamed at Canas to help her carry Morales into the car. He refused because Morales had "just tried to kill [him]." Perla and Jorge pulled Morales into the car, and Curiel drove them to the hospital. Morales died there from gunshot wounds to the chest and abdomen.

Canas remained at the scene. When police arrived, they recovered the rifle from him. Several expended shell casings and a knife were found in the street. Perla's car was still at the location. Its rear license plate was obscured with an "X" fashioned from red duct tape. A roll of similar tape and a baseball bat were found inside the car. Although Morales's sister testified that she saw a knife at the crime scene after the shooting, crime scene experts had found no second knife at the scene, and Canas testified that he was unarmed.[5]

Perla was charged with the attempted murder of Canas and the murder of Morales. (Pen. Code, §§ 664, 187.)[6] The information charged that she had personally used and intentionally discharged a firearm in committing the attempted murder. (§ 12022.53, subds. (b), (c).) The jury convicted her of the first degree murder of Morales and the attempted premeditated and deliberate murder of Canas, with personal use of a firearm. It rejected the allegation that she

---

[5] Morales's sister, Marlen, testified that four or five days after Morales's death, she went to the scene and discovered a 10-inch serrated knife with a long black handle. She said she kicked it into the bushes. Although a detective interviewed her eight days after the incident, Marlen did not mention finding this knife.

[6] All statutory references are to the Penal Code.

5

had intentionally discharged a gun in connection with the attempted murder. Perla was sentenced to prison for 25 years to life on the murder conviction, and a concurrent life term and 10-year firearm enhancement for the attempted murder.

The judgment was affirmed. The Court of Appeal unanimously concluded, inter alia, that Perla's conviction of the first degree murder of Morales was supported by substantial evidence. The panel also unanimously determined that the jury had been erroneously instructed. The jury was not told that to convict Perla of first degree murder under the provocative act doctrine it had to find that she *personally* premeditated and deliberated the attempted murder of Canas. (See *Concha*, *supra*, 47 Cal.4th at p. 666.) The court disagreed about the effect of the error. The majority held the error harmless while the dissenting justice found it prejudicial.

We granted review limited to the issues of whether sufficient evidence supports the conviction for first degree murder and whether the instructional error was harmless beyond a reasonable doubt. The evidentiary sufficiency question turns on the provocative act doctrine and its analytical place in the law of homicide, which we discuss in some detail. We conclude the evidence here was sufficient and, although the jury was given a potentially misleading instruction on this topic, the error was harmless. We therefore affirm the judgment of the Court of Appeal.

## DISCUSSION

### I.    *Substantial Evidence Supports the Murder Conviction*

In reviewing a sufficiency of evidence challenge, we view the evidence in the light most favorable to the verdict and determine whether *any* rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (*Cervantes, supra*, 26 Cal.4th at p. 866; *People v. Caldwell* (1984) 36 Cal.3d 210, 217.)

It will be helpful in resolving this matter to bear in mind several general principles in the law of homicide. A conviction for murder requires the

commission of an act that causes death, done with the mental state of malice aforethought (malice). (§ 187.) Malice may be either express or implied. (§ 188.) Express malice is an intent to kill. (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102.) Implied malice does not require an intent to kill. Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses. (*People v. Knoller* (2007) 41 Cal.4th 139, 152.) A person who acts intending to kill victim A but who accidentally kills victim B instead may be guilty of B's murder under the doctrine of *transferred intent*. (*People v. Bland* (2002) 28 Cal.4th 313, 320-321.)

The law recognizes two degrees of murder. The degrees are distinguished by the mental state with which the killing is done. A person who kills unlawfully with implied malice is guilty of second degree murder. (*People v. Knoller*, *supra*, 41 Cal.4th at pp. 151-152.) A person who kills unlawfully and intentionally is guilty of first degree murder if the intent to kill is formed after premeditation and deliberation. (§ 189; see *People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.)[7] If the person kills unlawfully and intentionally but the intent to kill is not formed after premeditation and deliberation, the murder is of the second degree. (*People v. Nieto Benitez*, *supra*, 4 Cal.4th at p. 102.)

While implied malice murder does not require an intent to kill, *attempted murder* does require a specific intent to kill. (*People v. Guerra* (1985) 40 Cal.3d 377, 386.)[8] The crime of attempted murder is not divided into degrees, but the

---

[7]    Section 189 also provides that murder is in the first degree if it is done by particular means, such as through poison or lying in wait, or under particular circumstances, such as in the course of a rape or robbery. (§ 189.) We do not discuss these other types of first degree murder here.

[8]    An accomplice can be guilty of attempted murder if the accomplice aids and encourages an attempted murder knowing of the direct perpetrator's intent to kill and intending to facilitate the killing. (*People v. Lee* (2003) 31 Cal.4th 613, 624; *People v. Prettyman* (1996) 14 Cal.4th 248, 259.) In other words, "the

sentence can be enhanced if the attempt to kill was committed with premeditation and deliberation. (*People v. Smith* (2005) 37 Cal.4th 733, 740.) In general, attempted murder is punishable by imprisonment for a term of five, seven, or nine years. (§ 664, subd. (a).) However, if either the defendant or an accomplice formed the intent to kill with premeditation and deliberation, punishment for the attempted murder is increased to life imprisonment with possibility of parole. (§ 664, subd. (a); *People v. Lee*, *supra*, 31 Cal.4th at p. 624.)

Under the *felony murder* doctrine, when the defendant or an accomplice kills someone during the commission, or attempted commission, of an inherently dangerous felony, the defendant is liable for either first or second degree murder, depending on the felony committed. If the felony is listed in section 189, the murder is of the first degree; if not, the murder is of the second degree. (§ 189; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1140-1141.) Felony murder liability does not require an intent to kill, or even implied malice, but merely an intent to commit the underlying felony. (*People v. Cavitt* (2004) 33 Cal.4th 187, 197.) If the killing is not committed by the defendant or an accomplice, however, the felony murder doctrine does not apply. (*People v. Washington* (1965) 62 Cal.2d 777, 781-783.)

When someone other than the defendant or an accomplice kills during the commission or attempted commission of a crime, the defendant is not liable under felony murder principles but may nevertheless be prosecuted for murder under the *provocative act* doctrine. The provocative act doctrine is to be distinguished from the felony murder rule. "A provocative act murder case necessarily involves at least three people—in our case, the perpetrator of the underlying offense, an accomplice, and a victim of their crime. [Citation.]" (*People v. Briscoe* (2001) 92 Cal.App.4th 568, 581.) A variation on the law of transferred intent, the

person guilty of attempted murder as an aider and abettor must intend to kill." (*People v. Lee*, at p. 624.)

8

provocative act doctrine holds the perpetrator of a violent crime vicariously liable for the killing of an accomplice by a third party, usually the intended victim or a police officer. (*Ibid*.; see *People v. Gilbert* (1965) 63 Cal.2d 690, 705 (*Gilbert*).) Under the *felony murder rule*, if an accomplice is killed by a crime victim and not by the defendant, the defendant cannot be held liable for the accomplice's death. (*Gilbert*, at p. 703; *People v. Washington, supra*, 62 Cal.2d at p. 781.) The provocative act doctrine is not so limited. Under the provocative act doctrine, when the perpetrator of a crime maliciously commits an act that is likely to result in death, and the victim kills in reasonable response to that act, the perpetrator is guilty of murder. (*Gilbert*, at pp. 704-705; *People v. Briscoe*, at p. 581.) "In such a case, the killing is attributable, not merely to the commission of a felony, but to the intentional act of the defendant or his accomplice committed with conscious disregard for life." (*Gilbert*, at p. 704.)[9]

A murder conviction under the provocative act doctrine thus requires proof that the defendant personally harbored the mental state of malice, and either the defendant or an accomplice intentionally committed a provocative act that proximately caused an unlawful killing. (*Concha*, *supra*, 47 Cal.4th at pp. 660-661; *People v. Briscoe*, *supra*, 92 Cal.App.4th at p. 582.) A provocative act is one that goes beyond what is necessary to accomplish an underlying crime and is dangerous to human life because it is highly probable to provoke a deadly response. (CALCRIM No. 560; see *People v. Lima* (2004) 118 Cal.App.4th 259, 265.) Although the doctrine has often been invoked in cases where the defendant initiates or participates in a gun battle (*Cervantes*, *supra*, 26 Cal.4th at p. 867), it is not limited to this factual scenario. (*People v. Lima*, at p. 266; see *Concha*, at

---

[9]    The provocative act doctrine may support either first or second degree murder. In order to return a first degree murder conviction, the jury must find that the defendant acted with express malice formed after deliberation and premeditation. (*Concha*, *supra*, 47 Cal.4th at p. 666.) We discuss the mental state required for first degree provocative act murder at pages 18-19, *post*, in connection with Perla's instructional error claim.

p. 658 [knife attack].)  Malice will be implied if the defendant commits a provocative act knowing that this conduct endangers human life and acts with conscious disregard of the danger.  (*People v. Roberts* (1992) 2 Cal.4th 271, 317; *Gilbert*, *supra*, 63 Cal.2d at p. 704.)

An important question in a provocative act case is whether the act *proximately caused* an unlawful death.  "[T]he defendant is liable only for those unlawful killings proximately caused by the acts of the defendant or his accomplice.  [Citation.]  'In all homicide cases in which the conduct of an intermediary is the actual cause of death, the defendant's liability will depend on whether it can be demonstrated that [the defendant's] own conduct *proximately* caused the victim's death . . . .'  [Citation.]  '[I]f the eventual victim's death is not the natural and probable consequence of a defendant's act, then liability cannot attach.'  [Citation.]"  (*Concha*, *supra*, 47 Cal.4th at p. 661.)  When the defendant commits an inherently dangerous felony, the victim's self-defensive killing is generally found to be a natural and probable response to the defendant's act, and not an independent intervening cause that relieves the defendant of liability.  (*Ibid.*; *Cervantes*, *supra*, 26 Cal.4th at pp. 868-869; *Gilbert*, *supra*, 63 Cal.2d at pp. 704-705.)  The question of proximate cause is ordinarily decided by the jury, unless undisputed evidence reveals "a cause so remote that a court may properly decide that no rational trier of fact could find the needed nexus."  (*People v. Roberts*, *supra*, 2 Cal.4th at p. 320, fn. 11.)

This record contains ample evidence to support a conclusion that Perla committed a provocative act that caused Canas to kill Morales.  The evening before the killing, Perla plotted with Ricardo and other members of the family to "kick [Canas's] ass."[10]  That night, Perla went with Morales and Jorge to meet Canas, anticipating a violent confrontation.  Morales brought a BB gun and shot it

---

**10**     Perla argues her acts before the confrontation cannot be considered "provocative acts" because Canas was unaware of them.  However, Perla's earlier conduct is highly relevant to prove her own state of mind.

out the car window several times while waiting for Canas. As noted, Canas did not appear. The next morning, Perla set events in motion. She roused first Jorge and then Morales for another attack on Canas. It was Perla's idea to ambush Canas at the corner where he routinely picked up his young daughter. They stopped at Ricardo's house to make sure he had not yet done so. She then drove to the corner with a loaded rifle in her car, and she tried to induce Osguera to leave the scene before their target arrived. While Morales attacked Canas and stabbed him, Perla stayed near the car containing the rifle she had brought. When Canas appeared to get the upper hand in the fight, Morales ran to Perla. Perla got the rifle from her car, cocked it, and turned toward Canas. Having made clear to Morales what she intended him to do, she handed him the rifle. A struggle ensued during which Canas was shot three times. He then managed to seize the gun and shoot his attacker.

By bringing a loaded rifle to the scene, preparing it for firing, then handing it to her accomplice, Perla dramatically escalated the level of violence in the encounter. Introducing a loaded firearm into the fight went beyond the acts necessary to "kick [Canas's] ass." In producing the rifle, turning it toward Canas, and putting it in the hands of Morales, who had just stabbed Canas in the face, Perla performed acts " 'fraught with grave and inherent danger to human life.' " (*Taylor v. Superior Court* (1970) 3 Cal.3d 578, 584, overruled on other grounds in *People v. Antick* (1975) 15 Cal.3d 79, 92, fn. 12.)

Perla argues her conduct was not sufficiently violent to support the conviction because some cases have stated that provocative act murder liability must be premised on a "life-threatening act" that provokes a deadly response. (See, e.g., *In re Joe R.* (1980) 27 Cal.3d 496, 505; *People v. Mai* (1994) 22 Cal.App.4th 117, 124, overruled on other grounds in *People v. Scott* (2009) 45 Cal.4th 743, 749.) However, read in context, the phrase "life-threatening act" is essentially a shorthand definition that restates the proximate cause requirement of provocative act murder. We have used the phrase, for example, in summarizing

11

*People v. Gilbert*'s holding that provocative act murder requires an intentional act that is beyond what is necessary to commit the underlying felony and that provokes a lethal response from the victim or a police officer. (See *In re Joe R.*, at p. 502, citing *Gilbert*, *supra*, 63 Cal.2d at p. 704.) A provocative act is conduct that is dangerous to human life, not necessarily in and of itself, but because, in the circumstances, it is likely to elicit a deadly response. The danger addressed by the provocative act doctrine is not measured by the violence of the defendant's conduct alone, but also by the likelihood of a violent response. Thus, our cases have not required any particular level of violence to support provocative act murder liability. For example, in *People v. Caldwell*, *supra*, 36 Cal.3d at page 218, we found sufficient evidence to support the provocative act murder conviction of a defendant who left a car after a high-speed chase while holding, but not pointing, a gun. (See *id*. at pp. 226, 228 (dissenting opn. of Bird, C.J.) [noting that the gun was not pointed].)

The evidence also establishes that Perla acted with malice. She put the violent conduct in motion after a night of repose. She recruited her brother and boyfriend to ambush Canas. She confirmed the child had not been picked up. She drove to the ambush location with her license plate obscured and with a loaded gun in her car. She watched as Morales stabbed Canas. The jury could infer from this evidence that Perla planned the assault on Canas and planned for either herself or her accomplices to use deadly force in the assault. Indeed, she expressed a clear intent for Morales to shoot Canas when she faced Canas before handing the loaded, cocked weapon to her boyfriend. This uncontested evidence about Perla's use of the gun, and the jury's finding that she used a firearm, supports the conclusion that she acted with malice. (See *Gilbert*, *supra*, 63 Cal.2d at p. 704; *People v. Lima*, *supra*, 118 Cal.App.4th at p. 267; see also *post*, at pp. 18-22 [addressing whether malice here was express or implied].)

Finally, substantial evidence demonstrates that Perla's provocative acts proximately caused Morales's death. "To be considered a *proximate* cause of [the

12

victim's] death, the acts of the defendant[] must have been a 'substantial factor' contributing to the result. [Citations.]" (*People v. Caldwell*, *supra*, 36 Cal.3d at p. 220.) Morales stabbed Canas but then lost the fight and ran toward Perla. It was in this context that she got the rifle, cocked it, and then handed it to her accomplice. The death of one of the participants was a natural and probable consequence of Perla's conduct. (See *Cervantes*, *supra*, 26 Cal.4th at p. 869; *People v. Roberts*, *supra*, 2 Cal.4th at p. 321.) This was a classic example of bringing a gun to a knife fight, planning in advance to have deadly capacity available if an initial attack is unsuccessful. Although Canas was the person who ultimately fired the shots that killed Morales, Canas's intervention was not a superseding cause of death because, as we have observed, it is reasonably foreseeable that a crime victim will use force in self-defense. (*Cervantes*, at p. 871; *Gilbert*, *supra*, 63 Cal.2d at p. 705.)

This fact pattern is distinguishable from the one presented in *Cervantes*. Cervantes and other Highland Street gang members attended a large party thrown by the Alley Boys gang. The two gangs were peaceful until Cervantes argued with a woman who was associated with the Alley Boys gang, leading one of its members to chide Cervantes for acting disrespectfully. (*Cervantes*, *supra*, 26 Cal.4th at pp. 863, 872, fn. 12.) The conflict escalated, and Cervantes shot Richard Linares, an Alley Boys gang member who had intervened in an effort to defuse the situation. (*Ibid.*) A melee followed and gang challenges were exchanged. A minute or two later, a group of Alley Boys shot and killed Hector Cabrera, whom they recognized as a member of the Highland Street gang. (*Ibid.*) On appeal, we concluded Cervantes could not be held liable under the provocative act doctrine because his conduct was not a proximate cause of Cabrera's murder. (*Id.* at p. 872.) Cervantes was not the initial aggressor in the incident that gave rise to the melee. There was no evidence Cabrera's killers had seen Cervantes shoot Linares, and Cervantes had fled the scene by the time Cabrera was shot. (*Ibid.*) Because the Alley Boys killers were not responding to Cervantes's act by

13

shooting back at him, or an accomplice, their killing of Cabrera could not be considered a " 'reasonable response to the dilemma thrust upon [them]' " by Cervantes's conduct. (*Id*. at p. 873, quoting *Gilbert*, *supra*, 63 Cal.2d at p. 705.) Instead, the killers acted on their own initiative to avenge a situation in which neither they nor their victim had been involved. Based on these facts, we concluded the willful and malicious murder of Cabrera was a product of the Alley Boys' independent criminal conduct and, thus, an intervening cause that absolved Cervantes of liability. (*Id*. at pp. 872-874.)

The circumstances here are quite different. The jury rejected Perla's assertion that, when Canas killed Morales, Canas acted with malice and used force beyond that allowed for lawful self-defense. The entire episode was thrust upon an unsuspecting Canas, who responded to Perla's provocative acts by disarming and killing Morales. Under these circumstances, Canas's self-defensive actions were neither criminal nor an independent cause of death. Thus, *Cervantes* is distinguishable. Canas's subsequent conduct is also consistent with this conclusion. Canas did not flee or try to dispose of the weapon. Instead, although injured himself, he remained at the scene, surrendered the gun, and cooperated with police.

Perla also asserts she cannot be held liable because *Morales's* provocative acts led to his own death. We have held that a defendant cannot be held vicariously liable for aiding and abetting an accomplice in criminal acts that led to the accomplice's death. (*People v. Antick, supra*, 15 Cal.3d 79, disapproved on a related ground in *People v. McCoy* (2001) 25 Cal.4th 1111, 1119-1120, 1123.) In *Antick,* we stated that "neither the felony-murder doctrine nor the theory of vicarious liability may be used to hold a defendant guilty of murder *solely* because of the acts of an accomplice, if the accomplice himself could not have been found guilty of the same offense for such conduct." (*People v. Antick*, at p. 89, italics added.) However, *Antick* was a case of pure vicarious liability. Although Antick had aided and abetted in a crime that led the police to his accomplice, he was not

14

present when officers confronted the accomplice and shot him dead. (*Id*. at pp. 83-84.) Here, substantial evidence supports the murder conviction based on Perla's *own* provocative acts. As we explained in *People v. Caldwell*, *supra*, 36 Cal.3d at pages 220-221, when the conduct of two felons acting in concert provokes a deadly response, the question is only whether the defendant's acts were a *substantial* factor contributing to the resulting death. If so, that defendant is guilty. Accompanying provocative acts of the accomplice do not dissipate culpability. Morales and Perla acted together to try to kill Canas. Because Perla's own provocative acts were a substantial factor in causing the death of Morales, the *Antick* line of cases does not apply. (*Id*. at p. 221.)

Finally, Perla's persistence in pursuing a violent confrontation with Canas is significant. The decision to abandon a conflict is an important one in the law. Doing so may indicate a lack of criminal intent.[11] A refusal to do so may reflect the required mens rea. Here, Perla had many opportunities to walk away from the conflict but relentlessly refused to do so. After the "family council" in which she raised the prospect of assaulting Canas, she went with Jorge and Morales to the place chosen for the fight. She knew that Morales had a BB gun because he shot it several times out the car window. When they left the scene because Canas did not arrive, there was a major break in the action. But Perla refused to let matters lie. The next day, even after rounding up her accomplices and bringing a gun to the scene, she had several opportunities to turn away from the potential for violence. As noted, the trio had to wait for Canas's arrival. Rather than leave, Perla stayed and tried to persuade Osguera to depart. During the initial conflict between Canas and Morales, Perla did nothing to try to stop the fight. When Morales ran to her,

---

[11] For example, abandonment can be a defense to attempted crimes. CALJIC No. 6.02 states: "If a person intends to commit a crime but, before committing any act toward the ultimate commission of the crime, freely and voluntarily abandons the original intent and makes no effort to accomplish it, that person has not attempted to commit the crime." (See also CALCRIM No. 460.)

15

they could have withdrawn. Instead, Perla raised the level of violence by introducing the rifle. These facts reflect Perla's relentless pursuit of a violent confrontation, the deadly potential of which she ensured.

## II.    *Instructional Error Was Harmless*

As noted, Perla was convicted of the attempted premeditated and deliberate murder of Canas. She did not challenge that conviction in the Court of Appeal or otherwise claim the jury was improperly instructed on that count. She does assert error, however, in the instructions addressing the mental state required to convict her of the first degree murder of Morales.

The jury instructions summarized the possible options for verdicts on the charged offenses.[12] With respect to the crime against Canas (count 1), the jury was told it could find Perla guilty of either attempted murder or attempted voluntary manslaughter, or not guilty of any crime. The jury was instructed accordingly on the required elements of attempted murder (CALCRIM No. 600) and attempted voluntary manslaughter, under the theories of heat of passion (CALCRIM Nos. 603) and imperfect self-defense (CALCRIM No. 604). With respect to the death of Morales (count 2), the jury was told it could find Perla guilty of either first or second degree murder, voluntary manslaughter or not guilty of any crime. It was instructed on the requirements for provocative act murder (CALCRIM No. 560), and on the lesser included offense of voluntary manslaughter (CALCRIM Nos. 570, 571).

The jury received potentially confusing instructions about how to determine the degree of the Morales murder. With regard to the provocative act murder of Morales, the jury was told: "If you decide that the defendant is guilty of murder, you must decide whether the murder is first or second degree. [¶] To prove that the defendant is guilty of first degree murder, the People must prove that: [¶] One,

---

[12]    The instructions also explained the various options and requirements for separate findings on the allegations related to these charges. Because those instructions are not relevant to the issue before us, we do not discuss them.

16

as a result of the *defendant's* provocative act, Fernando Morales was killed during the commission of attempted willful, deliberate, and premeditated murder; and [¶] Two, *defendant intended* to commit attempted willful, deliberate, and premeditated murder when she did the provocative act. [¶] In deciding whether the *defendant intended* to commit attempted willful, deliberate, and premeditated murder and whether the death occurred during the commission of attempted willful, deliberate, and premeditated murder, you should refer to the instructions I have given you on attempted willful, deliberate, and premeditated murder." (CALCRIM No. 560, italics added.)**13** The jury was instructed on the mental state for attempted murder pursuant to CALCRIM No. 601: "If you find the defendant guilty of attempted murder under Count 1, you must then decide whether the People have proved the additional allegation that the attempted murder was done willfully, and with deliberation and premeditation. [¶] The *defendant Perla Gonzalez* acted *willfully* if she intended to kill when she acted. The *defendant Perla Gonzalez deliberated* if she carefully weighed the considerations for and against her choice and, knowing the consequences, decided to kill. The *defendant*

---

**13** CALCRIM No. 560 sets forth two alternatives for defining what constitutes a first degree murder under the provocative act doctrine: (1) the defendant's provocative act was a murder or attempted murder that the defendant personally committed willfully, deliberately, and with premeditation; or (2) the defendant's provocative act caused death during the defendant's intentional commission of one of the enumerated felonies in section 189. The trial court instructed the jury with the second of these alternatives, cross-referencing the instruction on attempted murder. However, attempted murder is not one of the enumerated felonies in section 189. (*Concha*, *supra*, 47 Cal.4th at p. 661, fn. 2.) When a defendant's provocative act is committed in the course of an attempted murder, as occurred here, the jury should be instructed on first degree murder in accordance with CALCRIM No. 560's explanation of deliberation and premeditation. In contrast to the "enumerated felony" alternative, this instruction specifically cautions that a conviction of first degree provocative act murder requires a finding that the defendant "*personally* . . . acted willfully, deliberately, and with premeditation when the (murder/attempted murder) was committed." (CALCRIM No. 560, italics added; see *Concha*, at p. 666.)

17

*Perla Gonzalez premeditated* if she decided to kill before acting. [¶] **The attempted murder was done willfully and with deliberation and premeditation if *either the defendant or Fernando Morales or both of them acted with that state of mind.***" (All emphasis added.)

These instructions properly informed the jury that, before Perla could be convicted of the provocative act murder of Morales, the prosecution had to prove Morales was killed during the commission of an attempted premeditated and deliberate murder. Furthermore, the jury was instructed that a first degree murder conviction required a finding that Perla *herself* acted with an intent to kill formed after deliberation, and with premeditation, when she committed the provocative act. The terms "willful," "deliberate," and "premeditated" were properly defined and linked to Perla. It is the last sentence of CALCRIM No. 601, set out in boldface above, that creates the potential for confusion. That sentence is a correct statement of the mental state requirements for an *attempted* murder committed by a defendant and an accomplice. When referred to in the context of defining a first degree provocative act murder, however, the sentence gives the incorrect impression that the defendant can be found to have acted with premeditation and deliberation if *either* the defendant or an accomplice harbored that mental state.

We recently explained the circumstances in which liability for first degree murder may attach under the provocative act doctrine: "Where the individual defendant personally intends to kill and acts with that intent willfully, deliberately, and with premeditation, the defendant may be liable for first degree murder for each unlawful killing proximately caused by his or her acts, including a provocative act murder. Where malice is implied from the defendant's conduct or where the defendant did not personally act willfully, deliberately, and with premeditation, the defendant cannot be held liable for first degree murder." (*Concha*, *supra*, 47 Cal.4th at pp. 663-664.) The mens rea required for a first degree murder is thus different from that required for attempted murder. Whereas an attempted murder conviction requires that *either* the defendant or a principal

18

acted with premeditation and deliberation, "for a first degree murder conviction [under the provocative act doctrine], the jury must find that the individual defendant *personally* acted willfully, and with deliberation and premeditation during the attempted murder. ([*People v.*] *McCoy*, *supra*, 25 Cal.4th at p. 1118.)" (*Concha*, at p. 666.) Accordingly, when a provocative act theory is relied on, the jury should be instructed that first degree murder requires proof that the defendant personally premeditated and deliberated the attempted murder that provoked a lethal response.

Here, the jury was properly instructed in detail about the mental state *Perla* was required to have in order to be convicted of the first degree murder of Morales. However, because the court cross-referenced CALCRIM No. 601's instruction on attempted murder, they were also told that the mens rea requirement for this conviction could be satisfied if Morales acted with premeditation and deliberation in attempting to kill Canas. The final sentence of CALCRIM No. 601 is an incorrect statement of the mens rea required for first degree murder under the provocative act doctrine, as the Attorney General concedes.

Both sides agree the instructions were deficient, but they disagree about whether the error requires reversal. (See *Concha*, *supra*, 47 Cal.4th at pp. 666-667 [remanding for determination of prejudice].) The conflicting sentence in CALCRIM No. 601 had the potential to override, or cancel out, the otherwise correct instructions the jury received on first degree murder, making it conceivable that the jury could convict on first degree murder without deciding whether Perla acted with premeditation and deliberation. The same potential for prejudice arises when jury instructions omit an element of an offense. Accordingly, we consider the prejudicial effect of the error here in the context of cases dealing with the failure to instruct on all elements of an offense.

"[A]n instructional error that improperly . . . omits an element of an offense . . . generally is not a structural defect in the trial mechanism that defies harmless error review and automatically requires reversal under the federal

19

Constitution." (*People v. Flood* (1998) 18 Cal.4th 470, 502-503.) Instead, an erroneous instruction that omits an element of an offense is subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18. (*Neder v. United States* (1999) 527 U.S. 1, 15 (*Neder*); *People v. Prieto* (2003) 30 Cal.4th 226, 256.) In general, the *Chapman* test probes "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citations.]" (*Neder*, at pp. 15-16.) The high court in *Neder* analogized instructional errors that arguably prevent the jury from finding an element of an offense to the erroneous admission or exclusion of evidence. (*Id*. at pp. 17-18.) In such cases, "the harmless-error inquiry must be essentially the same: Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" (*Id*. at p. 18.)

The jury heard uncontroverted evidence that Perla personally premeditated and deliberated the attempted murder of Canas. Perla came to her brother Ricardo's house the night of his dispute with Canas. She plotted with others to assault Canas in retribution. She went with her brother Jorge and Morales to the spot where they planned to fight Canas. After that goal was thwarted because Canas did not arrive, Perla devised a new plan, which she launched the next morning. With her license plate obscured and a loaded rifle in the back of her car, she rounded up her accomplices and checked to make sure Canas had not yet picked up his daughter. She then drove to the planned ambush spot and waited for Canas. She urged an adult witness (Osguera) to leave before the confrontation occurred. During the ensuing fight initiated by her accomplice, Perla waited by the car, the rifle within reach. When the fight turned against Morales, Perla immediately seized the loaded weapon, pulled back the hammer so that it was ready to fire, and handed it to Morales for him to use against Canas.

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27, we identified three categories of evidence relevant to determining premeditation and deliberation: (1) events before the murder that indicate planning; (2) a motive to kill; and (3) a

20

manner of killing that reflects a preconceived design to kill.  As we have repeatedly pointed out, and now reaffirm, "[t]he *Anderson* guidelines are descriptive, not normative.  [Citation.]"  (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.)  They are not all required (see *People v. Lucero* (1988) 44 Cal.3d 1006, 1021), nor are they exclusive in describing the evidence that will support a finding of premeditation and deliberation.  (*People v. Perez*, at p. 1125.)

Even so, the evidence here satisfies all three *Anderson* factors.  The jury could have fairly concluded the following:  (1) Perla planned to attack Canas when he was especially vulnerable, both because he did not expect the confrontation with people who were strangers to him and because he was in the presence of his three-year-old daughter.  Perla planned to use deadly force against Canas because she brought a loaded rifle to the ambush site and stood within grabbing distance of the weapon throughout the fight.  She obscured her license plate to thwart identification and apprehension.  (2) Perla had a motive to kill Canas because of his conflict with her brother.  (3) When Canas successfully fought off a knife attack, Perla deliberately escalated the violence of the encounter by handing her accomplice a loaded, cocked rifle.  Her orchestration of an armed assault on an unsuspecting, unarmed man, and her giving of a gun to a man she knew had just used deadly force, are acts that reflect a preconceived design to kill.  The incident could have ended when Morales ran from the fight toward Perla at the car.  Rather than permit cessation of the hostilities, Perla handed Morales the cocked and loaded rifle she had brought to ensure that Canas would be punished and, if necessary, killed.  From this evidence, it is clear beyond a reasonable doubt that a rational jury would have found Perla premeditated and deliberated the attempted murder of Canas.  (*Neder*, *supra*, 527 U.S. at p. 18; *People v. Concha* (2010) 182 Cal.App.4th 1072, 1089-1090.)

The defense strongly contested Perla's intent to kill Canas, claiming instead that she acted in self-defense or defense of others.  Defense counsel argued that Perla handed Morales the gun because she wanted to help him protect himself, not

21

because she had maliciously intended that he use it to kill. However, in finding Perla guilty of attempted murder, the jury necessarily determined that she personally intended to kill Canas. " '[T]he crime of attempted murder requires a specific intent to kill . . .' [Citation.]" (*People v. Guerra*, *supra*, 40 Cal.3d 377, 386.) Apart from disputing her intent to kill, Perla introduced no evidence or argument challenging the prosecution's case on the *Anderson* premeditation and deliberation factors. As the Court of Appeal determined on remand in *People v. Concha*,[14] here "the evidence [Perla] introduced dealt with [her] participation in the murder and [her] intent to kill, and the jury found against [her] on those points. [She] did not contest the facts that go specifically to premeditation and deliberation . . . ." (*People v. Concha*, *supra*, 182 Cal.App.4th at p. 1090.) Thus, "[t]he facts supporting premeditation and deliberation were uncontradicted once the intent element was established." (*Ibid*.)

The evidence of Perla's planning and deliberation was quite strong. Conversely, the evidence that Morales *alone* intended a deadly outcome was weak. Perla was clearly the driving force behind the attack. She was the one with the motive and hostility toward Canas. Morales did not even know Canas. Perla recruited him to participate, and, when the fight turned against him, Perla urged him to shoot Canas with a loaded rifle. Perla's brother Jorge said he would attack Canas with a baseball bat, and Morales agreed to help if Canas was besting Jorge. The evidence suggests Morales was thrust into a leading role only because Jorge left to secure help with Perla's disabled car. When Perla handed Morales the loaded rifle, he had been disarmed and was losing the fight. Morales may have believed he needed to shoot in self-defense, or he may have made an impulsive

---

[14]    We reversed the judgment in *Concha*, *supra*, 47 Cal.4th at page 667, for the same instructional error that occurred here. On remand, the Court of Appeal determined the error was harmless beyond a reasonable doubt because evidence that the defendant personally premeditated and deliberated the attempted murder was uncontradicted. (*People v. Concha*, *supra*, 182 Cal.App.4th at pp. 1089-1090.)

decision to use the rifle and win the fight. In contrast, Perla's life was never in danger, and there is no evidence suggesting her decision to retrieve and cock a loaded rifle that *she* brought to the fight was rash or unconsidered. On this evidence, it is highly unlikely that a rational jury would have concluded Morales alone acted with deliberate deadly intent, and convicted Perla of first degree murder based on Morales's state of mind.

Finally, Perla argues the instructional error cannot be considered harmless because, even if a hypothetical rational jury would have found she acted with premeditation and deliberation, there is an indication that *this* jury may have rendered a verdict tainted by the error. Like the dissenting justice below, she finds it significant that the jury sent out a note during deliberations requesting an explanation of second degree murder. In response, the court directed the jury to CALCRIM No. 560. As noted, CALCRIM No. 560 directly and accurately described the state of mind Perla herself must have formed to be guilty of first degree murder. However, the version of CALCRIM No. 560 given to this jury also referred to the instruction on attempted murder for an explanation of premeditation and deliberation.

In light of the jury's question, Perla argues the appropriate test of prejudice is not whether a rational jury would have found she acted with premeditation and deliberation (*Neder*, *supra*, 527 U.S. at p. 18), but whether circumstances make it clear beyond a reasonable doubt that *this* jury so found. She argues *Neder*'s harmless error test applies only when the omitted element is undisputed and supported by overwhelming evidence. Because her mental state was a hotly contested issue at trial, Perla contends the appropriate harmless error test is furnished not by *Neder*, but by *Yates v. Evatt* (1991) 500 U.S. 391, 404-405. We disagree. *Yates* articulated guidelines for determining when an erroneous mandatory presumption instruction is harmless. The prejudicial impact of such an error is quite different from the omission of an instruction on a required element of an offense. Presumptions narrow the jury's focus and may potentially cause jurors

23

to ignore evidence related to the matter presumed.  (See *id*. at pp. 405-406.)
Although the *Chapman* test typically requires harmlessness to be judged from a
review of the entire record (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681), it
cannot always be assumed that a jury instructed with an erroneous mandatory
presumption did, in fact, consider all the evidence on the issue in question.  (*Yates*,
at pp. 405-406.)  Thus, *in this specific context*, *Yates* held that "the issue under
*Chapman* is whether the jury actually rested its verdict on evidence establishing
the presumed fact beyond a reasonable doubt, independently of the presumption."
(*Yates*, at p. 404.)

By contrast, *Neder* furnishes the appropriate harmless error test for
instructions that erroneously omit an element of an offense.  (*People v. Mil* (2012)
53 Cal.4th 400, 409-415.)  In this context, the *Neder* court concluded a
demonstration of harmless error does not require proof that a particular jury
"*actually* rested its verdict on the proper ground (*Neder*, *supra*, 527 U.S. at
pp. 17–18), but rather on proof beyond a reasonable doubt that *a rational jury*
would have found the defendant guilty absent the error (*id*. at p. 18).  Although the
former *can be* proof of the latter (see *id*. at p. 26 (conc. opn. of Stevens, J.)), the
*Neder* majority made clear that such a determination is not essential to a finding of
harmlessness (*id*. at p. 16, fn. 1), which instead 'will often require that a reviewing
court conduct a thorough examination of the record' (*id*. at p. 19)."  (*People v.
Cross* (2008) 45 Cal.4th 58, 71, second italics added (conc. opn. of Baxter, J.).)

We have exhaustively reviewed the trial evidence to determine "whether
the record contains evidence that could rationally lead to a contrary finding with
respect to the omitted element" of premeditation and deliberation.  (*Neder*, *supra*,
527 U.S. at p. 19; see *People v. Mil*, *supra*, 53 Cal.4th at p. 417.)  We have
concluded no rational juror could find that Perla intended to murder Canas but did
not personally act with premeditation and deliberation.

Perla speculates that the jury's request for an instruction on second degree
murder indicates it was focused on the issue of whether she could be held

vicariously liable for Morales's mental state. However, other concerns may have just as easily prompted the request. The jury's note first asked, "Is [instruction] #39 for second degree murder?" It then stated, "We need an explanation of 2nd degree murder." Although the jury had received instructions on all the lesser included offenses of murder and attempted murder, and a specific instruction defining premeditated and deliberate *attempted murder*, it received no separate instruction explaining what constitutes a second degree murder. The jury was simply told, as jurors have long been instructed in this state, that a murder that does not meet the requirements of first degree murder is murder in the second degree. The jury may have believed it was missing a necessary instruction, or it may have been confused about the difference between lesser degrees of an offense and lesser included offenses. The jury asked whether instruction No. 39 described second degree murder, but this instruction set forth the required elements of voluntary manslaughter based on heat of passion, a lesser included offense of murder.[15] Nor do we believe the court's response, referencing CALCRIM No. 560, necessarily renders the error prejudicial. If that were the standard, any instructional error that elicits a related jury question would be reversible per se, without regard to the evidence. That is not the law. (*Neder*, *supra*, 527 U.S. at pp. 8-9; see also *Washington v. Recuenco* (2006) 548 U.S. 212, 218-221.)

Because the evidence shows beyond a reasonable doubt that a rational jury would have found that Perla personally premeditated and deliberated the attempted murder of Canas, the absence of an instruction on this point was harmless. (*Neder*, *supra*, 527 U.S. at p. 18.)

---

[15] Instruction No. 39 was CALCRIM No. 570, "Voluntary Manslaughter: Heat of Passion—Lesser Included Offense."

25

## DISPOSITION

The judgment of the Court of Appeal is affirmed.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Gonzales

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 190 Cal.App.4th 968
**Rehearing Granted**

_____

**Opinion No.** S189856
**Date Filed:** July 5, 2012

_____

**Court:** Superior
**County:** San Bernardino
**Judge:** Michael Knish, Commissioner

_____

**Counsel:**

Laura G. Schaefer, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Steven T. Oetting, Gil Gonzalez and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Laura G. Schaefer
Boyce & Schaefer
934 23rd Street
San Diego, CA  92102-1914
(619) 232-3320

William M. Wood
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2202