Filed 7/21/14  P. v. Cantu CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>ALEJANDRO CANTU,<br><br>      Defendant and Appellant. | B249649<br><br>(Los Angeles County<br>Super. Ct. No. BA386273) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Monica Bachner, Judge.  Affirmed.

Roberta Simon, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stephanie A. Miyoshi and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Alejandro Cantu challenges his conviction on three counts of attempted willful, deliberate, and premeditated murder. He claims the evidence is insufficient to support the findings that the attempted murders were willful, deliberate and premeditated. We find sufficient evidence and affirm the judgment.

**FACTUAL AND PROCEDURAL SUMMARY**

Appellant and Jackeline R. began dating in July 2010. She became pregnant soon after, and the baby was born in early April 2011. DNA testing revealed that appellant was not the father of the child, and the relationship ended.

On the evening of July 1, 2011, Jackeline and some neighbors and friends were gathered outside her apartment complex on Normandie Avenue in Los Angeles. The group included Roger, who was Jackeline's boyfriend at the time, and her friend Noel. Also in the group was Edgardo Valdivias. Jackeline had met Edgardo on Facebook; she was unaware that he was appellant's friend.

Around midnight, most of the group went to a nearby arcade to play pool, but Jackeline and Roger stayed behind. While at the arcade, Edgardo and one of Jackeline's neighbors got into a fight. After the fight, most of the group, except for Edgardo, returned to the apartment complex. Eventually only Noel, Jackeline and Roger were left outside the complex.

At about 3:30 a.m., as Jackeline and Roger were saying goodbye to Noel, appellant drove up to the complex with Edgardo and another man. Appellant and the other man got out of the car. Appellant pointed a shotgun at Noel's face and asked who he was. Before Noel had a chance to answer, appellant shot him. Noel remembers appellant saying something like, "This is for my homey." Jackeline yelled to Roger that it was her baby's daddy, and she told Roger to run. She and Roger began running up the stairs toward her apartment. Appellant shot at them as they ran, hitting Jackeline in her face and shoulder.

2

Noel was shot in the left shoulder, neck, and jaw, and suffered severe injury. Half of his left jaw is metal and that side of his face is concave. Part of Jackeline's eyebrow was blown off and her left eye had to be removed.

Three weeks later, appellant was arrested in Fresno. He was returned to Los Angeles, where he was interviewed by police. He told the officers that he broke up with Jackeline in late April 2011 after finding out the baby was not his. During their relationship they argued, but there were no physical fights, and no reports to the police. The month after they broke up, his apartment was burglarized. He lost his rent money, video game systems and other belongings, and had to move into his parents' home. Appellant bought the shotgun on June 1 because he felt vulnerable after the burglary.

The night of the incident, appellant learned that his friend Edgardo Valdivias had been ambushed and beaten up by Jackeline's friends. Appellant talked to Edgardo on the phone later that night to find out what had happened. Edgardo said Jackeline had asked Edgardo where appellant was living and said she had been looking for appellant. She told Edgardo she wanted to do something to hurt appellant and his family. When Edgardo told Jackeline appellant's apartment had been burglarized, she laughed. This made appellant think she was involved in the burglary. He did not go to the police, believing they would not help him. Instead he decided to take care of things on his own.

Appellant picked up Edgardo and another friend. He stopped a short distance away from Jackeline's apartment, got the shotgun out of the trunk and loaded it. He drove to the apartment, ran up to the victims while armed with the shotgun, and "that was it." He had told his friends he was just going to point the shotgun at the victims, "[b]ut I guess at the last minute, I just snapped and fired." After the shooting, appellant drove off.

Appellant was charged by information in counts 1 through 3 with attempted willful, deliberate, and premeditated murder (Pen. Code, §§ 664, 182)[1] and in count 4 with aggravated mayhem (§ 205). It was alleged that he personally used a firearm and

---

[1]     All statutory references are to the Penal Code.

3

that he caused great bodily injury in the commission of the crimes on Jackeline and Noel. He was found guilty on all charges, and the special allegations were found true. He was sentenced to state prison on count 1 for life, plus 25 years to life; on count 2 to a consecutive sentence of life, plus 25 years to life; on count 3 to a consecutive sentence of life, plus 20 years; and on count 4 to life, plus 25 years to life. The sentence on count 4 was stayed pursuant to section 654. This is a timely appeal from the judgment of conviction.

## DISCUSSION

Appellant claims there was insufficient evidence to support the jury's findings that the attempted murders were willful, deliberate, and premeditated. "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

"'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citations.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 767.)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*), the Supreme Court described three types of evidence that indicate premeditation and deliberation: facts about how and what the defendant did before the killing which indicate planning; facts about the defendant's prior relationship or conduct with the victim from which a motive to kill may be inferred; and, facts about the manner of the killing from which a preconceived design may be inferred. The *Anderson* factors are not the exclusive means

4

for establishing premeditation and deliberation, but they do provide "a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations." (*People v. Thomas* (1992) 2 Cal.4th 489, 517.) Using the *Anderson* factors for guidance, we find sufficient evidence of premeditation and deliberation.

Appellant broke off his relationship with Jackeline when it was determined he was not the father of her baby; he was upset that she had lied to him about that. Appellant told police Jackeline had harassed him after the breakup. He had purchased a shotgun because he felt vulnerable after the burglary. On the night of the shooting, Jackeline had laughed when Edgardo told her about the burglary of appellant's apartment, causing appellant to believe she and her friends were responsible for it. Jackeline asked Edgardo where appellant lived, and said she had been looking for him. Appellant felt threatened by her when Edgardo told him about this conversation. He felt the police would not protect him, so he decided to take action on his own.

Appellant also was upset that Jackeline's friends beat up Edgardo. "He's just a person that I hung out with once, and for them to do that to, to somebody that has nothing to do with me and Jackie's personal drama is—you know, that got me very upset, too." His intent to avenge this fight is evident from his statement just before he shot Noel in the face: "This is for my homey." Appellant's simmering animosity toward Jackeline, his fear of her perceived threats, and his anger about Edgardo's beating support the inference that he had motives for killing.

Appellant's actions on the night of the incident and the manner of the shooting suggest preexisting reflection and weighing of considerations. Consistent with appellant's intent to avenge Edgardo's ambush, appellant stopped to pick up Edgardo before proceeding to Jackeline's apartment. Although he told the police he only intended to scare the victims, he stopped near Jackeline's apartment to load the shotgun before proceeding to her apartment. He then drove to the apartment, took the loaded shotgun from the trunk, and walked up to the gate where Noel was talking to Jackeline and Roger. Appellant asked Noel his name, but did not wait for an answer before firing the shotgun.

He was only three feet away when he fired the shot directly at Noel's face.  Appellant then turned his gun on Jackeline and Roger, who were running up the stairs toward her apartment, firing at them three or four times.

Bringing a loaded shotgun to an encounter supports the inference that appellant planned a violent encounter.  (*People v. Marks* (2003) 31 Cal.4th 197, 230; see also *People v. Gonzalez* (2012) 54 Cal.4th 643, 664-665 [bringing a cocked and loaded rifle to a fight is evidence of premeditation and deliberation].)  A close-range shooting without any provocation or evidence of struggle has been recognized as evidence of premeditation and deliberation.  (*Ibid*.)

Additional support comes from the weapon itself.  Srinivasan Rathinam, the Los Angeles Police Department firearms examiner, testified that the shotgun appellant used in the shooting was a "pump action shotgun.  So after you fire, you need to pump the firearm.  The empty shells will be [extracted] out, and the next one will be loaded, then you can fire it."  Appellant had to pump the firearm each time he fired the shotgun.  His repeated action—firing once at Noel, then firing three or four times at Jackeline, each time having to pump the shotgun—further  supports the inference that appellant was acting with purpose and deliberation.  There was no hesitation, no brandishing, no attempt simply to scare the victims.

Evidence of appellant's motive, preparation, and actions supports the jury's determination that the attempted murders were committed with premeditation and deliberation.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**

                                                    EPSTEIN, P. J.

We concur:

WILLHITE, J.

EDMON, J.*

_____

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

7