Filed 10/24/14  P. v. Yi CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B251560 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA081781) |
| v. | |
| JAE HEE YI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Bruce F. Marrs, Judge.  Affirmed in part, reversed and remanded in part with directions.

Law Offices of Ronald A. Ziff, Ronald A. Ziff and Abby Besser Klein, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

# I.  INTRODUCTION

A jury convicted defendant, Jae Hee Yi, of first degree murder.  (§§ 187, subd. (a).)  The jury found the murder occurred while defendant was engaged in the commission of robbery, burglary or carjacking.  (§ 190.2, subd. (a)(17).)  The jury also convicted defendant of:  first degree in concert robbery (§§ 211, 213, subd. (a)(1)(A));  first degree residential robbery (§ 211); carjacking (§ 215, subd. (a)); and first degree burglary, with another person present.  (§§ 459, 667.5, subd. (c)(21).)  The trial court found defendant had a prior serious felony conviction (case No. KA055011) within the meaning of sections 667, subdivisions (a)(1), (b) through (i), and 1170.12.  The trial court further found defendant had served two prior prison terms (case Nos. FRE006868 and 03NF4021) within the meaning of section 667.5, subdivision (b).  Defendant was sentenced to life without the possibility of parole enhanced by five years.  This was the second time defendant was tried for these crimes.  The first trial ended in a mistrial.

# II.  THE EVIDENCE

## A.  The Prosecution's Case

### 1.  Overview

Summarized in a light most favorable to the judgment, the evidence was as follows.  Defendant was a member of a burglary conspiracy which targeted Indian families.  The perpetrators routinely stole cash, jewelry, electronics and vehicles.  During the present burglary, Panalal Shah was murdered.  Mr. Shah suffered blunt force trauma causing multiple bruises and abrasions, fractured ribs and vertebrae, and a fractured spine.  He was found with his hands and feet bound lying face down on his bedroom floor.  Defendant made admissions to his girlfriend, Jennifer Pasasouk, and an

acquaintance, Josephine Chai.  Defendant admitted assaulting a man.  Defendant thought the man had died.

## 2.  The evidence

### a.  December 4, 2007 burglary and murder

On December 4, 2007, defendant and several accomplices burglarized a Diamond Bar home.  They entered the home after prying off a window screen at the back of the house.  They attempted unsuccessfully to access a safe inside an armoire.  Several tools, including a screwdriver, were left on the floor near the armoire.  Latex gloves were also left on the floor.  They were visible in the crime scene photographs.  And the victims' Mercedes was stolen.  There was evidence that subsequent to the burglary defendant had the key to the Mercedes in his possession and knew where it had been parked.  The Mercedes was later found in West Covina.  Boxes of latex gloves had been left in the vehicle.

During the burglary, Mr. Shah was murdered.  The time of death was estimated at between 1 and 4 a.m.  Mr. Shah was found lying face down on his bedroom floor.  His hands and feet were bound with Christmas tree lights.  He had suffered multiple blunt force injuries.  He had multiple bruises and abrasions, fractured ribs and vertebrae and a thoracic spine fracture.  Two preexisting conditions may have contributed to Mr. Shah's death—osteoporosis, causing his bones to be weak and break easily, and coronary artery disease.  Dr. Juan Carrillo, a deputy medical examiner, testified at trial that Mr. Shah had a 50 percent narrowing of a major coronary artery.  A 50 percent narrowing of a major coronary artery decreases the blood flow to the heart.  Dr. Carrillo explained, "In any situation of stress, the heart requires more oxygen, and this can deprive the heart of the oxygen it needs."  Dr. Carrillo further explained that if an individual in Mr. Shah's condition were tied up, facedown, with no ability to move, death could ensue:  "The person's entire weight is on his chest and he will have difficulty breathing.  If he is

3

unable to turn his body, even though his face may be uncovered, eventually he will tire out and will be unable to breathe, and die." Given that Mr. Shah's ribs had been fractured and vertebrae bruised and crushed, Dr. Carrillo concluded: "With the injury to the spine, it would prevent his lower extremities from moving. So any ability for him to try to turn and remove himself from this situation is gone; and, therefore, he'd remain on his chest. [¶] Injuries to the ribs now compromise his ability to breathe. He can't expand his chest very well with the fractured ribs. On top of that, now he's facedown with his entire weight, so that further decreases his ability to breathe." If he remained in that position unattended for a period of time, he would die. Dr. Carrillo was unable to say whether a younger, healthier man with these injuries would have survived.

Details of the crime were not made public. The location and the murder victim's name were disclosed. Information about the Mercedes was given only to law enforcement agencies.

b. Ms. Chai's January 9, 2008 arrest and interview

On January 9, 2008, Ms. Chai was arrested on drug charges. Sergeant Randy Seymour interviewed Ms. Chai in custody the following day, January 10. Sergeant Seymour offered to "walk" the charges against Ms. Chai if she told him who perpetrated the Shah burglary and murder. Ms. Chai said three people were involved. Defendant was one of them. Ms. Chai had seen defendant with two pieces of jewelry, presumably from the burglary. Ms. Chai thought the jewelry had since been sold. Ms. Chai told Sergeant Seymour she overhead defendant talking to her boyfriend. Ms. Chai refused to name her boyfriend. Her boyfriend was later identified as Steven Phong (Steven). The conversation occurred at around 4 a.m. the day of the murder: "[Defendant] was saying . . . that he wanted to get in the safe but he couldn't get in. He's saying that the [Mercedes is] somewhere." With respect to the murder, Ms. Chai told Sergeant Seymour, "[A]nd I guess the old man came downstairs, into . . . the room, and [defendant] didn't get really into detail about [it] and I got the gist that something bad

4

happened." Ms. Chai said, "[They hurt the old guy because] [h]e was making noises." Sergeant Seymour ended the interview after Ms. Chai continually refused to identify the perpetrators other than defendant.

Ms. Chai later testified before a grand jury. She described defendant as a potentially violent person, "I've seen [him] get angry with people that he thought were snitching on him." She also testified, "I have never seen him actually beat anybody up, but I have seen him hold a gun to somebody." Ms. Chai also told the grand jury that on the morning following the Shah burglary, defendant had said to her, "I think I killed somebody." Defendant told Ms. Chai "they" went to the Shah home because there was a safe, but they were unable to get into it. Defendant told Ms. Chai a man showed up downstairs. Defendant restrained the man who resisted. Ms. Chai testified to the grand jury: "[Defendant] said he went in the house and . . . I don't think that he knew that anybody would be home. But he went in the house, and the old man obviously showed up downstairs. And . . . he did say that he – he sub – I can't think of the word now, sub, where you just hold somebody down like – so that can't move, like restraining him . . . and then the man resisted . . . and that's it. I don't think he knew that the man died." Ms. Chai said "they" took the man's black Mercedes and parked it somewhere. Defendant had the keys to the Mercedes.

At trial, Ms. Chai testified her statements to Sergeant Seymour and her grand jury testimony were untruthful. Ms. Chai said she did not hear any information about the burglary from defendant. She had heard about the Shah burglary on the news and had read about it on the Internet. She had not spoken to defendant about the burglary at all. Ms. Chai said she had implicated defendant because she hated him. Ms. Chai testified, "A lot of my testimony [before the grand jury] was because I had felt that [defendant] had robbed me when I was . . . dealing dope when I was on the streets." Ms. Chai also testified she made the untruthful statements because she wanted to get out of custody and she had been promised leniency. Ms. Chai told the grand jury what she thought the detectives wanted her to say.

5

c. The January 11, 2008 search pursuant to a warrant

On January 11, 2008, sheriff's investigators conducted a search of a home in Rowland Heights pursuant to a search warrant. Defendant lived in the home with Ms. Chai, Ms. Chai's boyfriend, Steven and her boyfriend's brother, Nelson "Nate" Phong (Mr. Phong). Sergeant Seymour saw a Lexus automobile at the location. Also on January 11, 2008, detectives searched a Rancho Cucamonga residence pursuant to a search warrant. Defendant and his girlfriend, Ms. Pasasouk, had been staying in the home. Officers found what appeared to be stolen electronics and currency, including Indian currency.

d. Ms. Pasasouk's January 11, 2008 interview

Defendant's girlfriend, Ms. Pasasouk, was present during the Rancho Cucamonga search. Sergeant Seymour interviewed Ms. Pasasouk. The interview was recorded, but the recording was lost prior to trial. Ms. Pasasouk told Sergeant Seymour the following. Defendant made a living committing "licks"—in other words, burglaries, robberies, thefts and drug dealing. Sergeant Seymour testified Ms. Pasasouk related the following, "She said that [defendant] had come home one morning rather upset, and he told her that he thought he had just killed somebody." Defendant said it happened during a burglary. The victim had been tied up and kicked. After that morning, defendant began committing burglaries about once a week. Defendant told Ms. Pasasouk he lost a cellular telephone during one of those subsequent burglaries. He left it in a car that was abandoned at the burglarized home.

e. Defendant's and Ms. Pasasouk's January 14, 2008 arrests and subsequent interviews

Defendant and Ms. Pasasouk were both arrested at a Fullerton hotel on January 14, 2008. This was a few days after Ms. Pasasouk spoke with Sergeant Seymour.

6

Ms. Pasasouk was charged as an accessory to murder. Male and female clothing and toiletries were in the hotel room together with a laptop computer, a small amount of methamphetamine, and more than $10,000 in cash. The laptop appeared to be relatively new. It contained pictures of an Indian family. It also contained a folder labeled "Pasadena." The folder held the names, addresses and telephone numbers of four Indian families in Pasadena. During booking, defendant said he was known by a moniker.

Sergeant Seymour interviewed Ms. Pasasouk in custody the day following her arrest. The jury heard a recording of that interview. Ms. Pasasouk repeated that defendant thought he had killed someone. She said defendant felt bad about it. Defendant knew he was wanted for murder. Ms. Pasasouk told Sergeant Seymour: "[Defendant] just told me that he tied up the person, he held down the person: he tied the person; he kicked them, it was a couple of times. But then . . . after that, you know, he didn't know if the man had a heart attack or not. But he was saying that he probably had a heart attack 'cause he stopped moving." According to Ms. Pasasouk, defendant's accomplices were Mr. Phong and John Smiles. Ms. Pasasouk overheard Mr. Phong and defendant talking. They had not known Mr. Shah would be home. They knew Mr. Shah had died, but they did not know whether he had suffered a heart attack. They also said that Mr. Smiles had "fucked up."

Ms. Pasasouk testified at trial under a conditional grant of immunity. Ms. Pasasouk admitted she told Sergeant Seymour the foregoing. She denied, however, that it was true. Ms. Pasasouk testified Sergeant Seymour gave her information about the burglary and told her to repeat it. Sergeant Seymour said if she implicated defendant, her children—who had been detained by the Department of Children and Family Services— would be returned to her. Ms. Pasasouk testified she only told Sergeant Seymour what he wanted to hear so that she could reclaim custody of her children.

Sergeant Seymour also interviewed defendant. The interview occurred on the day following defendant's arrest. The recorded interview was presented to the jury. Defendant admitted he was known by a particular moniker. At first defendant claimed he only held property stolen by others. Eventually, defendant admitted that he burglarized

7

houses.  He denied he had ever killed anyone.  Defendant asserted he was only the driver and lookout; he was not the one who set up the burglaries.  Defendant admitted driving to seven or eight burglaries including in Corona, Anaheim Hills, Hidden Hills, Hacienda Heights or La Puente, Boyle Heights and Rowland Heights.  Defendant specifically acknowledged his participation in the Corona burglary:  "[Defendant]:  Well, Corona's just—which one's Corona?  [¶]  [Sergeant Seymour]:  Corona's the one where you almost got caught.  [¶]  [Defendant]:  Oh, okay."  Defendant admitted a cellular telephone found at the Corona location was his:  "[Defendant]:  And the phones.  Honestly, only one of them was mine."  Defendant and his co-perpetrators repeatedly stole cash, electronics, jewelry and cars, including a Lexus, a Maxima and a Honda Accord.  Defendant named Steven, John Smalls, "Keith," and "[a] guy named Bethos" as among the perpetrators of the multiple burglaries.  Mr. Smalls handled the jewelry and sold it in Orange County.  Defendant said Steven got caught with the Lexus.  Defendant remembered Steven and "Joseph" driving the Lexus.  Defendant also told Sergeant Seymour he had left the Corona residence just before the detectives arrived.  As a result, defendant's accomplices thought he had "snitched."  Just after midnight, a text was sent to the cellular telephone defendant had left behind.  The text said:  "Where in the hell r u at?  dont even tell me that u knocked out wherever the fuck u at n dont expect me not to trip if u did, so call me from ur other phone[.]"

Sergeant Seymour told defendant Ms. Pasasouk had been arrested.  Only then did defendant admit his participation in the Diamond Bar burglary.  Defendant said there were four perpetrators—defendant, Mr. Smalls, "Bethos," and an otherwise unidentified Asian man.  They gained entry at the rear of the residence.  The burglars had been told there was $60,000 cash in the house.  Defendant said the burglars knew Mr. Shah would be present:  "It was done, it was done out of—it was—they knew that person was in the house.  Know what I mean?"  Defendant said he had been waiting outside in his truck but was summoned inside the Shahs' house.  The other burglars wanted defendant to tie up Mr. Shah.  The burglars inside the residence wanted Mr. Shah placed in defendant's truck:  "And they call . . . they wanted me at first, they wanted me to get the body and

8

load it up.  I'm like, fuck, no, man.  I ain't touching that body, man.  You know, like—you call me in the house to load it up?  No, man.  Know what I mean?"

At one point, defendant seemed unsure whether Mr. Shah's abduction or murder was an objective of the burglary:  "They wanted me to tie and take him to the car.  . . . I don't know if this was the job . . . if this is the reason why we came to the house for."  Defendant said:  "[L]ike they're like trying, trying to hold somebody down, whatever.  But like, it looked like—the guy wasn't even—they [wanted to] put him in the truck."  Upon entering the residence, defendant saw the armoire on the bedroom floor and Mr. Shah was "mostly on the floor."  Someone was holding Mr. Shah down.  Mr. Shah was alive and moving.  He was not tied up.  Mr. Shah was on his knees by the bed with his torso laid out across the bed.  It looked like there was a sheet over him.  (As Sergeant Seymour later testified, Mr. Shah was wearing a "lungee"—a linen wrap worn by Indian men.  That information had never been disclosed to the public.)  Defendant did not know who subsequently tied Mr. Shah's feet and hands:  "But like—the last time I know—like I know somebody—I don't know who tied him up.  I really don't know that part, sir.  Tied up or not.  But I heard—I know that he was trying to resist or something, and somebody just—you know what I mean—whacked him.  But he didn't like, uh, I guess whacked to the head or anything.  It was just, be quiet.  You know what I mean?  Type of thing."  Defendant left the house and returned to his truck where he waited.  Defendant saw someone drive the Shahs' Mercedes out of their garage.

Sergeant Seymour testified it was defendant who first mentioned the Mercedes.  Defendant also told Sergeant Seymour, "[T]he [Shahs'] son or somebody either owned or worked at a hotel or motel."  In fact, the Shahs did own a hotel in Colorado and their son did work there.  Further, defendant's description of Mr. Shah's fatal beating was consistent with Mr. Shah's injuries.  During the interview, defendant, who was nervous, expressed fears for his safety and that of his family and Ms. Pasasouk.  Sergeant Seymour testified, "He was fearful that if he gave names of certain individuals, especially one name in question, that that could have repercussions on his safety."  During the conversation, defendant asked if efforts could be taken to protect Ms. Pasasouk.  Sergeant

9

Seymour testified defendant expressed concern about protecting Ms. Pasasouk from a specific Latino gang. Sergeant Seymour was asked to describe the structure of the gangs in this state. After referring to the gang mentioned by defendant, Sergeant Seymour testified: "You have Southern California Hispanic gangs. Depending on who you are talking to and the context you are talking to, Hispanic gangs can go into a larger or more organized group, leading up to, and who I believe he was eventually talking about was the Mexican Mafia."

### f. Forensic evidence

Deoxyribonucleic acid evidence was taken from the Shahs' Mercedes and home. Footprint evidence was also recovered from the Shahs' backyard. The only possible match to defendant was deoxyribonucleic acid on a screwdriver found near the armoire in the Shahs' bedroom. Defendant and Mr. Shah were both possible contributors to the mix of deoxyribonucleic acid found on the screwdriver's handle. There was a 1 in 25 chance defendant was a contributor. Defendant's deoxyribonucleic acid was not found on any of several other tools that were examined in addition to the screwdriver. The one pair of defendant's shoes that was examined did not match the recovered footprint evidence.

### g. Uncharged burglaries evidence

The prosecution presented evidence that subsequent to Mr. Shah's killing, defendant committed several other burglaries. Two of the three targeted homes belonged to Indian families. On December 21, 2007, a La Verne residence was burglarized. The perpetrators entered through a bathroom window that faced the backyard. The victim, Ashok Patel, was a native of India. Mr. Patel testified his house was left in disarray: "Everything was upside down. Everything, all the items, they were everywhere in the hallway, on the bed. All the drawers were pulled out from the shel[v]ing." Jewelry, a computer, currency, including Indian money, and a Lexus automobile were stolen. The

10

Lexus was subsequently found at Ms. Chai's Rowland Heights residence. Defendant had also rented a room in that Rowland Heights home. Ms. Chai testified at trial that in December 2008 and January 2009, her boyfriend, Steven, was driving a Lexus. He claimed to have borrowed it. Property from the Patels' house was found in the January 11, 2008 search of defendant's Rancho Cucamonga home.

On December 29, 2007, Bill Carter's home in Corona was burglarized. Mr. Carter arrived home while the burglary was in progress. He notified law enforcement authorities. A door from the garage into the house had been "knocked down." Mr. Carter described the condition of his house: "It had been ransacked. The drawers in the master bedroom had been pulled out and stuff dumped on the . . . bed and the floor." According to Mr. Carter, a duffle bag had been filled with old cellular telephones and "odds and ends like that." A stolen Subaru had been abandoned in Mr. Carter's driveway. Several cellular telephones and two ski masks were in the Subaru. The discovery of cellular telephones in the Subaru was consistent with information Ms. Pasasouk gave Sergeant Seymour at their first meeting. Ms. Pasasouk said defendant had left a cellular telephone in a vehicle abandoned at the scene of a burglary subsequent to the present crimes. Moreover, as noted above, defendant admitted he had burglarized the Corona home and had left his cellular telephone in the Subaru. And a jewelry store receipt in defendant's name bore the telephone number associated with that cellular telephone. Defendant had purchased a "promise" or engagement ring for Ms. Pasasouk.

Also on December 29, 2007, a burglary occurred at Mahesh Bhatt's Anaheim Hills home. The burglars entered through a window towards the rear of the house. The house was left in a mess. Sergeant Luis Correa testified: "[The house] was in complete disarray. Everything that could be knocked off a shelf, overturned, looked at, looked through, it was completely ransacked. Mattresses off of the box springs. The rails, paintings off the walls and . . . torn. So everything is just everywhere." Three cars were stolen—a Ford Taurus, a Nissan Maxima and a Honda Accord. On January 11, 2008, investigators searched the Rancho Cucamonga home where defendant had been staying. The detectives found, among other items, a California driver's license for an individual

11

whose last name was Bhatt.  Sergeant Seymour had been unaware of the Anaheim Hills burglary until defendant mentioned it.

## B.  The Defense Case

### 1.  Cellular forensics evidence

Thomas Blackburn testified he was employed as an expert witness on matters relating to cellular technology.  Mr. Blackburn investigated whether defendant's cellular telephone was in the vicinity of the Shah residence at the time of the killing.  This was the cellular telephone found in the Subaru in Corona.  Defendant's cellular telephone was on and operating at the time.  Telephone calls made at 10:28 p.m. and 1:24 a.m. demonstrated the cellular telephone was then at least five miles from the Shahs' house.  No calls were made or received in the vicinity of the Mercedes abandoned in West Covina.  Mr. Blackburn conceded there was a 2-hour, 56-minute gap between the last call made on December 3, 2007, and the first call made on December 4, 2007.  The cellular telephone data also demonstrated it had been regularly used in the Rowland Heights and Rancho Cucamonga areas.

### 2.  Forensic evidence

Mehul Anjaria explained the significance of the deoxyribonucleic acid evidence collected at the Shah home.  Mr. Anjaria said in a random test of 25 unrelated people, about 1 would be included as a possible contributor to the deoxyribonucleic acid mix on the screwdriver handle.  So if you had a population the size of California, 37 million people, 1.5 million would be possible contributors.  Mr. Anjaria concluded, "I would call this very weak evidence associating [defendant] with the screwdriver."

12

### 3. False confession evidence

Richard Angelo Leo is a law professor who also has a Ph.D. in social psychology. Dr. Leo testified about "how certain people or situations can influence others" to behave. More specifically, Mr. Leo testified about law enforcement interrogation techniques and how they can lead to false confessions. Dr. Leo testified that the goal of police interrogation is not always to get to the truth; rather, it is, '[T]o move a witness away from [an] account the police don't want to hear to get the account they do want to hear"; in other words, to obtain statements, admissions or confessions that can be used to obtain a conviction. Dr. Leo explained that law enforcement agents frequently attempt to persuade a suspect that he or she has "no way out." They may tell the suspect he or she would be better off admitting the crime because the individual will receive leniency. Or they frame the suspect's conduct as accidental or committed in self-defense in order to encourage an admission. The officers may also mischaracterize or falsify facts in an attempt to obtain incriminating statements. Dr. Leo concluded law enforcement interrogation techniques may lead to a search for statements supporting a conviction while ignoring evidence that does not.

### III.  DISCUSSION

### A.  Felony-Murder Jury Instruction

### 1.  Legal principles

Defendant was sentenced to life without the possibility of parole pursuant to a felony murder special circumstance finding under section 190.2, subdivision (a)(17) which states: "(a)  The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found . . . to be

13

true: [¶] . . . [¶] (17) The murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit, the following felonies [including robbery, burglary and carjacking]." Section 190.2, subdivision (b) discusses the special circumstance as applied to the *actual killer.* Section 190.2, subdivisions (c) and (d) address the special circumstance as applied to persons *not the actual killer.* Section 190.2, subdivision (c) provides: "Every person, not the actual killer, who *with the intent to kill*, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole . . . ." (Italics added.) Section 190.2, subdivision (d) states: "Notwithstanding subdivision (c), every person, not the actual killer, who, *with reckless indifference to human life and as a major participant*, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole . . . ." (*People v. Mil* (2012) 53 Cal.4th 400, 408-409; *People v. Estrada* (1995) 11 Cal.4th 568, 572.)

The jury was instructed on felony murder and aiding and abetting liability. However, defendant contends, the Attorney General concedes, and we agree there was instructional error. The parties do not dispute there was sufficient evidence for a reasonable jury to conclude defendant was not Mr. Shah's actual killer and did not have an intent to kill. Therefore, the trial court erred in refusing defendant's request for instruction on the reckless indifference and major participant elements. (§ 190.2, subd. (d); *People v. Mil, supra,* 53 Cal.4th at p. 409; see *People v. Rountree* (2013) 56 Cal.4th 823, 854.) In failing to so instruct, the trial court omitted two essential elements of the charge. (*People v. Mil, supra,* 53 Cal.4th at p. 409; see *People v. Contreras* (2013) 58 Cal.4th 123, 164.)

14

We apply the harmless error standard of review. (*People v. Nunez and Satele* (2013) 57 Cal.4th 1, 45; *People v. Mil, supra,* 53 Cal.4th at pp. 405, 409-417.) We must conduct a thorough examination of the record to determine whether, beyond a reasonable doubt, the jury's verdict would have been the same absent the instructional error. (*People v. Gonzalez* (2012) 54 Cal.4th 643, 666; *People v. Mil, supra,* 53 Cal.4th at p. 417.) We must consider whether the evidence was such that a rational factfinder could have concluded defendant was not a major participant or did not act with reckless indifference. (*People v. Gonzalez, supra,* 54 Cal.4th at p. 666; *People v. Mil, supra,* 53 Cal.4th at p. 418.) In other words, we must consider whether the record supports a reasonable doubt as to either omitted element. (*People v. Gonzalez, supra,* 54 Cal.4th at p. 666; *People v. Mil, supra,* 53 Cal.4th at p. 418.) The instructional error is harmless if the omitted elements were uncontested and are supported by overwhelming evidence. (*People v. Gonzalez, supra,* 54 Cal.4th at p. 666; *People v. Mil, supra,* 53 Cal.4th at p. 417; see *People v. Aranda* (2012) 55 Cal.4th 342, 367-368; *People v. Marshall* (1997) 15 Cal.4th 1, 42 [failure to instruct that special circumstance required intent to kill was prejudicial under the *Chapman v. California* (1967) 386 U.S. 18, 24 standard because intent to kill evidence was sufficient but not overwhelming].)

## 2. Major participant

The Court of Appeal has held that "major participant" as used in section 190.2, subdivision (d) does not have a technical meaning peculiar to the law. (*People v. Proby* (1998) 60 Cal.App.4th 922, 933; see *People v. Smithey* (1999) 20 Cal.4th 936, 980-981.) The Courts of Appeal have defined "major participant" thusly: "As used in the term "'major participant,'" the word "'major'" means "'notable or conspicuous in effect or scope'" or "'one of the larger or more important members . . . of a . . . group.'" (*People v. Proby*, *supra*, 60 Cal.App.4th at pp. 931, 933-934.)" (*People v. Smith* (2005) 135 Cal.App.4th 914, 928; *People v. Hodgson* (2003) 111 Cal.App.4th 566, 578 & fn. 23.)

"Major participant" does not require that the defendant be a "'ringleader'" with greater participation than others. (*People v. Proby*, *supra*, 60 Cal.App.4th at p. 934.)

There was overwhelming evidence defendant was a major participant in the Shah burglary. Defendant was a member of a burglary conspiracy. He made his living committing burglaries and other crimes. Defendant and his accomplices had committed a series of burglaries—four in the month of December 2007 alone. They routinely stole cash, jewelry, electronics and vehicles. They targeted Indian families. They chose the Shah home because they knew it contained a safe. They expected to find $60,000 in cash. Ms. Chai overheard defendant talking to Steven, her boyfriend. They discussed defendant's failed attempt to access the safe. Moreover, defendant told both Ms. Pasasouk and Ms. Chai he had committed the Shah burglary. Defendant admitted during those conversations assaulting Mr. Shah. After the assault, Mr. Shah stopped moving and died.

And, in the immediate aftermath of the crime, Ms. Pasasouk overheard defendant and Mr. Phong talking about how Mr. Shah had died. In addition, defendant had a key to the Shahs' stolen Mercedes and he knew its location. Even if the jurors disbelieved Ms. Pasasouk and Ms. Chai, defendant, when questioned after his arrest, admitted in some detail his participation in the burglary and homicide. The jury heard a recording of that interview. Defendant described how the burglars had gained entrance to the house. He knew the victims' son worked for a hotel. He admitted being inside the house. He admitted observing that Mr. Shah had been assaulted. When interviewed by Sergeant Seymour, defendant described why Mr. Shah was killed: "I know that he was trying to resist or something, and something just - you know what I mean - whacked him. But he didn't like, uh, I guess whacked to the head or anything. It was just, be quiet." Defendant described an assault that was consistent with Mr. Shah's blunt force trauma. He knew the Mercedes had been stolen. Further, there was a 1 in 25 chance defendant's deoxyribonucleic acid was on a screwdriver found in the Shah's bedroom. While arguably less than significant in a vacuum, this was material evidence of guilt when viewed in light of the record as a whole. Defendant participated in the burglary from its

16

commencement until he and his accomplices made their escape. When he learned he was suspected of burglary and murder, defendant attempted to flee. This was overwhelming evidence defendant was a major participant within the meaning of section 190.2, subdivision (d). No rational juror could have a reasonable doubt whether defendant was a major participant.

In support of his argument to the contrary, defendant's points to a jury question raised the morning of the day the jury returned its verdict. The jury inquired, "Would it be unreasonable to go against a charge in this case of [first] degree murder because there is no other charge available, such as manslaughter?" The trial court responded: "You must follow the evidence and the law as given to you in the instructions." Defendant asks us to conclude the jury posed the question because it was unconvinced defendant was a major participant in the burglary. However, defendant's argument is sheer speculation. (See *People v. Boyce* (2014) 59 Cal.4th 672, 716; *People v. Tamborrino* (1989) 215 Cal.App.3d 575, 587.)


3. Reckless indifference to human life


The language "reckless indifference to human life" in section 190.2, subdivision (d), derives from the opinion in *Tison v. Arizona* (1987) 481 U.S. 137, 158, and footnote 12. (*People v. Estrada, supra,* 11 Cal.4th at p. 575.) In *Tison*, the United States Supreme Court held "[R]reckless disregard for human life" means "knowingly engag[es] in criminal activities known to carry a grave risk of death . . . ." (*Tison v. Arizona, supra,* 481 U.S. at p. 157; see *Ring v. Arizona* (2002) 536 U.S. 584, 594.) The United States Supreme Court gave two examples: "[S]ome nonintentional murderers may be among the most dangerous and inhumane of all—the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property. This reckless indifference to the value of human life may be every bit as shocking to the moral sense as

17

an 'intent to kill.'" (*Tison v. Arizona, supra,* 481 U.S. at p. 157; see *Schad v. Arizona* (1991) 501 U.S. 624, 644.)

In *People v. Estrada, supra,* 11 Cal.4th at pages 577-578, our Supreme Court held "reckless indifference to human life" does not have a technical meaning peculiar to the law. Rather, our Supreme Court explained: "[It] is commonly understood to mean that the defendant was subjectively aware that his or her participation in the felony involved a grave risk of death. The common meaning of the term 'indifference,' referring to 'the state of being indifferent,' is that which is 'regarded as being of no significant importance or value.' (Webster's New Internat. Dict. (3d ed. 1981) p. 1151, col. 1.) To *regard* something, even to regard it as worthless, is to be aware of it. (See *id.* at p. 1911, col. 1 ['regard' is synonymous with 'consider, evaluate, judge']." (*People v. Estrada, supra,* 11 Cal.4th at p. 577; see *People v. Miranda* (2011) 199 Cal.App.4th 1403, 1421.) Our Supreme Court concluded, "[T]he generally accepted meaning of the phrase, 'reckless indifference to human life,' in common parlance amply conveys to the jury the requirement of a defendant's subjective awareness of the grave risk to human life created by his or her participation in the underlying felony." (*People v. Estrada, supra,* 11 Cal.4th at p. 578; accord, *People v. Mil, supra,* 53 Cal.4th at p. 417 ["reckless indifference to human life" means the defendant knowingly engaged in criminal conduct with subjective awareness the activity involved a grave risk of death]; see, e.g., *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1117; *People v. Smith, supra,* 135 Cal.App.4th at pp. 927-928.)

There was overwhelming evidence defendant acted with reckless indifference to human life. Defendant was one of four perpetrators of the present crimes. Defendant admitted to Ms. Pasasouk tying up, holding down and kicking Mr. Shah several times. Defendant told Ms. Pasasouk and Ms. Chai he thought he had killed somebody. Defendant and the other burglars beat Mr. Shah. Enough force was used to fracture Mr. Shah's vertebrae, ribs and spine. Defendant observed that Mr. Shah stopped moving. Defendant thought Mr. Shah might have suffered a heart attack. Defendant nevertheless

18

left Mr. Shah bound and lying face down on the floor. Defendant made no attempt to assist Mr. Shah.

Even when viewed in a light favorable to defendant, albeit discounting his false confession claim, the evidence established defendant's subjective awareness of a grave risk of death. When interviewed, defendant admitted observing that Mr. Shah had been assaulted and was incapacitated. Defendant knew Mr. Shah had resisted and had been "whacked." Defendant saw Mr. Shah "mostly on the floor." Mr. Shah was on his knees with his upper torso sprawled across the bed. Someone was trying to hold Mr. Shah down. Defendant said, "But like, it looked like—the guy wasn't even—they [wanted to] put him in the truck." Defendant's accomplices wanted defendant to bind Mr. Shah and remove "the body" from the house. Instead, defendant returned to his truck. This act of leaving the residence resulted in leaving Mr. Shah in the hands of defendant's assaultive accomplices. Defendant made no attempt to summon help. No rational juror could have a reasonable doubt whether defendant acted with reckless disregard for human life.

This case is distinguishable from *People v. Mil, supra,* 53 Cal.4th at pages 417-419. In *Mil,* our Supreme Court considered whether a failure to instruct on the major participant and reckless indifference elements of felony murder was harmless error. Our Supreme Court found there was substantial evidence the defendant had participated in a burglary and robbery in a motel room and had stabbed and killed the victim. However, our Supreme Court found there was also evidence the defendant had left the motel room ahead of his girlfriend. She then had an opportunity, unbeknownst to the defendant, to stab and kill the victim. The Supreme Court concluded the evidence supported a finding the defendant was unaware that: his girlfriend planned to use any force; that she was armed with a knife; or that she stabbed the victim. Therefore, a rational juror could have a reasonable doubt whether the defendant was subjectively aware of a grave risk of death when he participated in the burglary and robbery. The instructional error was not therefore harmless beyond a reasonable doubt. (*Id.* at p. 419.) Unlike the defendant in *Mil,* defendant cannot claim ignorance of Mr. Shah's predicament. Defendant admitted

19

perceiving Mr. Shah's condition. And defendant understood his accomplices' assaultive intent and conduct.

## B. Evidence Suppression Motion

In the trial court, defendant moved to suppress: "any and all evidence illegally seized from [defendant] and/or his property"; "any statements, observations and evidence which was [the] product of the original illegal taking of any property . . . which was seized without a warrant"; and "[i]n particular, . . . any computer evidence . . . ." (Emphasis omitted.) Defendant explained: "There were two . . . computers seized . . . . One was seized at a hotel and the other at [defendant's] believed to be residence." On appeal, defendant argues the trial court improperly denied his motion to suppress a computer and "other items" seized from the hotel room. He also challenges the failure to suppress evidence obtained from his cellular telephone. The later issue was never raised in the trial court. As a result it was forfeited. (§ 1538.5, subd. (m); *People v. Williams* (1999) 20 Cal.4th 119, 136; *People v. Davis* (2008) 168 Cal.App.4th 617, 629.)

A section 1538.5 motion must be made in writing and must specifically list the items of property or evidence sought to be suppressed. (§ 1538.5, subd. (a)(2).) The only item defendant specifically identified as having been seized from the hotel room was a computer. We need not determine whether the trial court's suppression denial ruling was in error. Even if there was a violation of defendant's Fourth Amendment rights, admission of the challenged evidence was harmless beyond a reasonable doubt under *Chapman v. California, supra,* 386 U.S. at page 24. (*People v. Moore* (2011) 51 Cal.4th 1104, 1128-1129; *People v. Prince* (2007) 40 Cal.4th 1179, 1250.) The primary issue at trial was the extent of defendant's involvement in the burglary and murder. The evidence on the computer seized at the hotel tended to corroborate evidence defendant and his accomplices targeted Indian homes. There is no showing the evidence of the computer's existence in the hotel room or its content had any significant impact on the jury's determination of the central issues at trial. In light of the overwhelming evidence of

20

defendant's guilt, any error was harmless beyond a reasonable doubt.  (See *People v. Moore, supra,* 51 Cal.4th at pp. 1128-1129; *People v. Prince, supra,* 40 Cal.4th at p. 1250.)

### C.  Uncharged Burglaries Evidence

#### 1.  Defendant's contention

Defendant asserts it was prejudicial error to admit uncharged burglaries evidence. (Evid. Code, § 1101, subd. (b).)  Defendant argues there was insufficient uniqueness and similarity to support admission.  We find no abuse of discretion.

#### 2.  Controlling legal principles

Other crimes evidence is inadmissible to prove a defendant's conduct on a particular occasion or criminal disposition.  (Evid. Code, § 1101, subd. (a); *People v. Harris* (2013) 57 Cal.4th 804, 841; *People v. Thomas* (2011) 52 Cal.4th 336, 354.)  But it may be admitted to prove some other fact such as intent, identity or common design. (Evid. Code, § 1101, subd. (b); *People v. Harris, supra,* 57 Cal.4th at p. 841; *People v. Thomas, supra,* 52 Cal.4th at p. 354.)  The prosecutor's argument paralleled these limited purposes for which other crimes evidence may be considered.  The necessary degree of similarity between the charged and uncharged crimes depends on the element sought to be proved.  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402; accord, *People v. Harris, supra,* 57 Cal.4th at p. 841; *People v. Thomas, supra,* 52 Cal.4th at p. 355.)  Our review is for an abuse of discretion.  (*People v. Harris, supra,* 57 Cal.4th at p. 841; *People v. Thomas, supra,* 52 Cal.4th at pp. 354-355.)  Our Supreme Court has explained:  "A court abuses its discretion when its ruling 'falls outside the bounds of reason.'  [Citations.]."  (*People v. Thomas, supra,* 52 Cal.4th at pp. 354-355; *People v. Carter* (2005) 36 Cal.4th 1114, 1149.)  The trial court did not abuse its discretion.

### 3. Intent

The least degree of similarity is required to prove intent. Our Supreme Court has held, "In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant, '"probably harbor[ed] the same intent in each instance." [Citation.]' (*People v. Robbins* [(1988)] 45 Cal.3d 867, 879.)" (*People v. Ewoldt, supra,* 7 Cal.4th at p. 402; accord, *People v. Harris, supra,* 57 Cal.4th at p. 841; *People v. Thomas, supra,* 52 Cal.4th at p. 355.) When interviewed after his arrest, defendant admitted he had committed a number of burglaries. In each of the prior cases, as in the present case, the burglars took jewelry, electronics, cash and vehicles. Defendant admitted being present in the Shahs' home. The other crimes evidence corroborated defendant's admissions. It supported a reasonable inference defendant's intent in the present case was to commit a similar burglary. The other crimes evidence also countered defendant's attempts to downplay his role in the present burglary. It undermined his effort to portray himself as a mere driver and lookout.

### 4. Common design or plan

A greater degree of similarity is required to prove a common design or plan. (*People v. Thomas, supra,* 52 Cal.4th at p. 355; *People v. Ewoldt, supra,* 7 Cal.4th at p. 402.) Our Supreme Court has explained: "To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual. . . . . [E]vidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts. Unlike evidence of uncharged acts used to prove identity, the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing

the charged offense.  (See *People v. Ruiz* [(1988)] 44 Cal.3d 589, 605-606.)"  (*People v. Ewoldt, supra,* 7 Cal.4th at p. 403; accord, *People v. Edwards* (2013) 57 Cal.4th 658, 712.)

The manner in which the other burglaries and the present burglary were committed was sufficiently similar to support an inference defendant committed the present burglary pursuant to the same plan.  The charged and uncharged burglaries were all committed in the same month, December 2007.  All but one was committed against an Indian family.  In each case the perpetrators entered through a door or window in an area not visible from the street.  They ransacked the houses.  They stole jewelry, electronics, cash and vehicles.

## 5.  Identity

The greatest degree of similarity is required for the uncharged crimes evidence to be relevant to prove identity.  (*People v. Harris, supra,* 57 Cal.4th at p. 841; *People v. Ewoldt, supra,* 7 Cal.4th at p. 403.)  As our Supreme Court has held:  "For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts.  (*People v. Miller* [(1990)] 50 Cal.3d 954, 987.)  'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' [Citation.]"  (*People v. Ewoldt, supra,* 7 Cal.4th at p. 403.)  The distinctive features of the uncharged and charged burglaries were threefold.  First, the burglars targeted Indian families.  Second, they ransacked the houses leaving little untouched.  Third, they stole vehicles.  These unusual features were sufficient to support an inference the same person or persons committed all of the crimes.

23

## D. The Gonzalez Matter

Prior to his first trial, defendant brought a motion to: "[P]resent the testimony of Herbert Gonzales, a former defendant in a [murder] case (dismissed July, 2006 on motion of the People) concerning the modus operandi of Los Angeles County Sheriff's [Sergeant] Randall Seymour in his mode of interrogation, intimidation, fabrication and exploitation—all in an effort to make it appear to a Court—at some later time—that [Sergeant] Seymour obtained a freely given, voluntary confession, or statements against one's penal interest, in compliance with both the requirements that a confession be free and voluntary and comply with the mandate of Miranda when in fact, it does not." Defendant represented that Mr. Gonzalez was under subpoena and available to testify. The trial court denied the motion. Prior to the present trial, defendant sought permission to cross-examine Sergeant Seymour about the Gonzalez matter. Defendant asked the trial court to take judicial notice of newspaper articles discussing the Gonzalez case. The trial court declined to take judicial notice and denied defendant's motion. On appeal, defendant argues the trial court abused its Evidence Code section 352 discretion and violated his confrontation and fair trial rights under the state and federal Constitutions. Defendant does not raise any issue with respect to the trial court's judicial notice ruling.

Defendant forfeited any claim in the present appeal with respect to testimony by Mr. Gonzalez. Defendant did not move to present Mr. Gonzalez's testimony in the present trial. Defendant made no showing Mr. Gonzalez was under subpoena or otherwise available to testify. Defendant cannot now claim the trial court erred in refusing to allow Mr. Gonzalez to testify. (See *People v. Dowl* (2013) 57 Cal.4th 1079, 1087-1089; *People v. Thompson* (2010) 49 Cal.4th 79, 129-130.)

We review the trial court's Evidence Code section 352 ruling in the present trial for an abuse of discretion. (*People v. Clark* (2011) 52 Cal.4th 856, 893; *People v. Williams* (2008) 43 Cal.4th 584, 634-635.) As our Supreme Court explained in *Williams*: "A trial court's discretionary ruling under [Evidence Code section 352] '"must not be disturbed on appeal except on a showing that the court exercised its discretion in an

arbitrary, capricious or patently absurd manner that resulted in a miscarriage of justice. [Citations.]"' (*People v. Rodrigues* [(1994)] 8 Cal.4th [1060,] 1124-1125.)" (*People v. Williams, supra,* 43 Cal.4th at pp. 634-635.) We find no such abuse of discretion in concluding the probative value was not outweighed by potential prejudicial effect. First, in the Gonzalez matter, there apparently was exculpatory deoxyribonucleic acid evidence lending credence to a false confession claim. There was no such exculpatory evidence in the present case. Second, defendant's interview was recorded. Mr. Gonzalez's was not. Third, defendant presented testimony from Dr. Lee as to the aim and effect of law enforcement interrogation techniques. Fourth, the trial court could reasonably conclude reference to the isolated Gonzalez matter in cross-examination of Sergeant Seymour would tend to confuse the jury, cause it to speculate as to the settlement, and take up undue time.

Having found no abuse of discretion, we turn to defendant's constitutional claims. (*People v. Moore* (2011) 51 Cal.4th 386, 407, fn. 6.) We find no constitutional fair trial or confrontation violation. This is because, "'"[A]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [state or federal constitutional] right to present a defense." [Citations.]' (*People v. Robinson* (2005) 37 Cal.4th 592, 626-627, fn. omitted.)" (*People v. Prince, supra,* 40 Cal.4th at p. 1245.) There is no showing here that the trial court's Evidence Code section 352 ruling infringed on defendant's constitutional rights.

Defendant makes passing reference on appeal to a request to discover information as to other homicide cases investigated by Sergeant Seymour. This argument is insufficiently developed to warrant discussion. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 726; *People v. Barnett* (1998) 17 Cal.4th 1044, 1182; *People v. Bonin* (1989) 47 Cal.3d 808, 857, fn. 6.) We note that we previously denied a mandate petition as to the trial court's denial of defendant's discovery request. We ruled, "Defendant, whose overbroad motion is unsupported by any relevant evidence, has failed to demonstrate an abuse of discretion occurred. [Citations.]" (*Yi v. Superior Court* (Apr. 21, 2011, B232421) [nonpub. order].) We reiterate that analysis today.

25

## E.  The Confidential Informant

Prior to the first trial in this case, on February 3, 2010, defendant filed a motion for confidential informant disclosure.  Defendant relied on information from the sheriff's "murder book" as follows.  On January 8, 2008, Sergeant Seymour spoke with a narcotics detective.  The narcotics detective told Sergeant Seymour an anonymous informant had identified defendant as Mr. Shah's murderer.  In identifying the murderer, the informant referred to defendant's moniker.  The anonymous informant also said "Nate" and "Cups," two brothers, were with defendant at the time.  Later that day Sergeant Seymour spoke with the anonymous informant.  The informant said Mr. Phong, Steven and defendant committed burglaries.  Mr. Phong and Steven, but not defendant, were staying at a house in Philips Ranch.  There were guns, drugs and stolen property in the Philips Ranch residence.  Prior to the foregoing conversation, defendant argues there was no connection between him and the murder.  The trial court denied defendant's motion.  On appeal, defendant argues:  "That information constituted the first known connection between [defendant] and the murder of Shah, and concerned the basic issue of [defendant's] guilt or innocence, including the requirement . . . that [defendant] be a 'major participant' in the burglaries . . . ."

A public entity has a privilege to refuse to disclose a confidential informant's identity when the need to preserve confidentiality outweighs the need for disclosure. (Evid. Code, § 1041; *People v. Hobbs* (1994) 7 Cal.4th 948, 958-959.)  The privilege gives way only when it appears the informant is a material witness on the question of guilt or innocence and nondisclosure would result in a fair trial denial.  (*People v. Lawley* (2002) 27 Cal.4th 102, 159; *People v. Borunda* (1974) 11 Cal.3d 523, 527; *People v. Hobbs, supra,* 7 Cal.4th at p. 959; *People v. Navarro* (2006) 138 Cal.App.4th 146, 163.)  Disclosure is required upon an adequate showing an informant:  participated in the crime or was an eyewitness to it; is a witness to circumstances preceding the crime; or otherwise can give evidence that might exonerate the defendant or offer an affirmative defense.  (*People v. Lawley, supra,* 27 Cal.4th at p. 159; *Twiggs v. Superior Court* (1983)

34 Cal.3d 360, 365; *Price v. Superior Court* (1970) 1 Cal.3d 836, 844.) The burden is on the defendant to demonstrate a reasonable possibility the informant could give potentially exculpatory evidence. (*People v. Lawley, supra,* 27 Cal.4th at pp. 159-160; *People v. Borunda, supra,* 11 Cal.3d at p. 527.) Moreover, "The defendant bears the burden of adducing ""'some evidence"" on this score. (*People v. Gordon* [(1990)] 50 Cal.3d [1223,] 1246[, overruled on a different point in *People v. Edwards* (1991) 54 Cal.3d 787, 835].)" (*People v. Lawley, supra,* 27 Cal.4th at pp. 159-160.) The necessary showing requires more than speculation or a mere suspicion the information will be relevant and helpful to the defense or essential to a fair trial. (*Davis v. Superior Court* (2010) 186 Cal.App.4th 1272, 1276; *People v. Luera* (2001) 86 Cal.App.4th 513, 526.) It requires at least a reasonable possibility. (*Ibid.*) Our review is for an abuse of discretion. (*People v. Hobbs, supra,* 7 Cal.4th at p. 976; *Davis v. Superior Court, supra,* 186 Cal.App.4th at p. 1277.) There was no abuse of discretion. Defendant made no showing of even a reasonable possibility the confidential informant was in any position to offer exculpatory evidence or support an affirmative defense.

## F. Cumulative Error

Defendant contends he is entitled to reversal because of cumulative error. We find no prejudicial legal error. Therefore, we reject defendant's argument the cumulative effect of all the errors requires reversal. (*People v. Jones* (2013) 57 Cal.4th 899, 981; *People v. Edwards, supra,* 57 Cal.4th at p. 746.)

## G. Peace Officer Personnel Records

Defendant requested that we independently review the record of the trial court's in camera hearing for review of peace officer personnel records. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1228-1232; *Pitchess v. Superior Court* (1974) 11 Cal.3d 531, 535.) The trial court found no complaints responsive to defendant's motion. We have reviewed the

transcripts of the trial court's April 15, 2010 in camera hearing. No abuse of discretion occurred. (*People v. Myles* (2012) 53 Cal.4th 1181, 1209; *People v. Mooc, supra,* 26 Cal.4th at pp. 1228, 1232.)

## H. Sentencing

### 1. Cruel and unusual punishment

Defendant contends his life-without-parole sentence as applied to him is so disproportionate that it constitutes cruel and unusual punishment under the state and federal Constitutions. Defendant asserts he did not participate in the killing. Defendant denies intending that Mr. Shah die. Defendant claims he did not want to be involved in moving Mr. Shah from the scene of the killing. Defendant argues he was not a major participant in the burglary and did not act with reckless indifference to human life. Defendant describes his liability as "entirely derivative and coincidental." Defendant further asserts 16 states impose less severe punishment for felony murder. We disagree.

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment. The Eighth Amendment does not require strict proportionality between the crime and sentence; rather, it forbids sentences that are grossly disproportionate to the severity of the crime. (*Ewing v. California* (2003) 538 U.S. 11, 23-24 (lead opn., O'Connor, J.) (*Ewing*); see *In re Coley* (2012) 55 Cal.4th 524, 529.) Three factors are considered: the gravity of the offense and the harshness of the penalty; sentences imposed for other crimes in the same jurisdiction; and sentences imposed for the same crime in other jurisdictions. (*Ewing, supra,* 538 U.S. at p. 22; *In re Coley, supra,* 55 Cal.4th at p. 540.) Here, defendant addresses only the first and third factors.

A sentence may be cruel or unusual under the California Constitution, article I, section 17. Such a sentence though must be so disproportionate to the crime that it shocks the conscience and offends fundamental notions of human dignity. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1287-1288; *In re Lynch* (1972) 8 Cal.3d 410, 424.) We

28

consider the nature of the offense, the offender and the particular circumstances of the crime. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1300; *People v. Dillon* (1983) 34 Cal.3d 441, 478 (*Dillon*).) Further, because choosing appropriate criminal penalties is a legislative function, a court must not intervene unless the prescribed punishment is out of proportion to the crime. (*Ibid.*; *People v. Felix* (2003) 108 Cal.App.4th 994, 999-1000.)

The sentence imposed on defendant was not cruel or unusual under the state or federal Constitutions. Defendant participated in a burglary during which Mr. Shah was killed. Defendant attempts to downplay his involvement. However, defendant was a member of a burglary conspiracy that had committed multiple burglaries. The conspiracy targeted Indian families. The perpetrators routinely stole cash, jewelry, electronics and vehicles. During the present burglary, defendant, at a minimum, tied up Mr. Shah. There is evidence defendant held down and kicked Mr. Shah. Mr. Shah stopped moving. Defendant thought Mr. Shah might have had a heart attack. Defendant later spoke to Ms. Pasasouk. Defendant expressed fear that Mr. Shah may have been killed. Defendant's accomplices wanted defendant to move Mr. Shah's body. Defendant refused. Defendant left the Shah residence without taking any steps to aid Mr. Shah. Defendant took no steps to preserve Mr. Shah's life. Mr. Shah was found face down on his bedroom floor with his hands and feet bound. Mr. Shah had suffered multiple blunt force injuries. His spine, vertebrae and ribs had been fractured.

In the years preceding the present crime, defendant had been convicted of several felonies. On March 13, 2002, defendant was convicted of assault with a deadly weapon other than a firearm (§ 245, subd. (a)(1)) and placed on probation. However, on December 3, 2003, defendant was arrested for first degree burglary (§ 459) and burglary tools possession (§ 466). And on February 18, 2004, defendant was arrested for felony vehicle theft (Veh. Code, § 10851, subd. (a)). On March 16, 2004, defendant received a 16-month sentence consecutive to his burglary sentence. Defendant's probation in his assault case was revoked and on September 16, 2004, defendant was sentenced to two years in state prison. On February 10, 2005, defendant was convicted of burglary and sentenced to two years in state prison. His sentence was concurrent with the assault case.

29

Defendant was paroled on September 23, 2005. He was discharged from parole on September 13, 2007. Less than three months later, defendant committed the present crimes. When interviewed after his arrest, defendant admitted having committed seven or eight additional burglaries.

Defendant relies on *Enmund v. Florida* (1982) 458 U.S. 782, 784 and *Dillon, supra,* 34 Cal.3d at page 480. In *Enmund,* a robbery at a farmhouse ended in a murder. But there was no evidence the defendant was present at the farmhouse when the murder occurred. It appeared, instead, the defendant was the driver who waited in a car by the side of the road a few hundred feet away. (*Enmund v. Florida, supra,* 458 U.S. at pp. 783-788.) The United States Supreme Court found the defendant did not personally kill or attempt to kill. The record did not warrant a finding he had any intention of participating in or facilitating a murder. And he merely aided and abetted a robbery during which a murder was committed. The United States Supreme Court concluded that under those circumstances the death penalty was impermissible under the Eighth Amendment. (*Enmund v. Florida, supra,* 458 U.S. at p. 798.) The circumstances of the present case are not comparable. Here, there was overwhelming evidence defendant was not merely a driver but fully participated in the burglary during which Mr. Shah was murdered. *Enmund* is inapplicable under the facts of our case. (*People v. Contreras, supra,* 58 Cal.4th at pp. 162-164; *People v. Young* (2005) 34 Cal.4th 1149, 1205.) And this case does not involve the death penalty, an important element of the *Enmund* analysis. (See *People v. Contreras, supra,* 58 Cal.4th at p. 163; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 192-193; *People v. Lancaster* (2007) 41 Cal.4th 50, 81-90.)

In *Dillon,* a 17-year-old and several others went to a marijuana farm to steal some marijuana. The defendant carried a .22 semi-automatic rifle. Some of his friends were armed with shotguns. They encountered an armed security guard. One of the defendant's companions accidentally fired his shotgun. The defendant began rapidly firing his weapon. The defendant fatally shot the guard. Our Supreme Court concluded the punishment for first degree murder was cruel and unusual under the circumstances and reduced the judgment to second degree murder. The court reasoned that when the

30

defendant heard gunshots, he thought one of his friends had been shot, and he thought he would be next. (*People v. Dillon, supra,* 34 Cal.3d at pp. 482-483.) In addition, there was evidence the defendant was extremely immature and exercised poor judgment. (*Id.* at p. 483.) Our Supreme Court noted that because the defendant was a minor, he would have received the same sentence as that the trial court imposed even if he had committed premeditated and deliberate first degree murder. (*Id.* at p. 487.) There are no comparable circumstances in the present case. Defendant, a recidivist, was not a minor. There was no evidence he was immature or exercised poor judgment. There was no evidence he acted out of fear he would be shot or otherwise harmed. *Dillon* is not controlling. (*People v. Rhodes* (2005) 126 Cal.App.4th 1374, 1389; *People v. Valdez* (2005) 126 Cal.App.4th 575, 581; see Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Punishment, § 283, pp. 385-386.)

Additionally, as the Attorney General points out, a number of other jurisdictions authorize a life-without-parole sentence for felony murder. These include: Colorado (Colo. Rev. Stat. §§ 18-3-102, 18-1.3-401; Georgia (Ga. Code § 16-5-1; Iowa (Iowa Code §§ 702.11(1), 707.2(1)(b), (2), 902.1; Louisiana (La. Rev. Stat. § 14:30); Mississippi (Miss. Code Ann. §§ 97-3-19(2)(e), 97-3-21(3)); Nevada (Nev. Rev. Stat. § 200.030(1)(b), (4)(b)); North Dakota (N.D. Cent. Code, §§ 12.1-16-01(1)(c), 12.1-32-01(1)); Oklahoma (Okla. Stat. Ann. 21, §§ 701.7(B), 701.9(A)); and Tennessee (Tenn. Code Ann., § 39-13-202(a)(2), (c)). Other jurisdictions treat the aggravated circumstances in our case as a matter requiring a life sentence without the possibility of parole. The sentence of life without the possibility of parole violates no provision of the state or federal Constitutions.

### 2. The prior prison term enhancements

We asked the parties to brief the question whether the trial court was required to either impose or strike (§ 1385, subd. (a)), rather than stay, the section 667.5, subdivision (b) prior prison term enhancements. (*People v. Langston* (2004) 33 Cal.4th 1237, 1241;

*People v. Garcia* (2008) 167 Cal.App.4th 1550, 1561; see *People v. Johnson* (2006) 145 Cal.App.4th 895, 908, fn. 20.)  The parties agree.  The failure to either impose or strike a prior prison term enhancement is a jurisdictional error that may be corrected for the first time on appeal.  (*People v. Garcia, supra,* 167 Cal.App.4th at p. 1562; *In re Renfrow* (2008) 164 Cal.App.4th 1251, 1254.)  Upon remittitur issuance, the trial court is to exercise its discretion whether to impose or strike the prior prison term enhancements (§ 667.5, subd. (b)) as to each of counts 1 and 3 through 6.

## IV.  DISPOSITION

The judgment staying the Penal Code section 667.5, subdivision (b) prior prison term enhancements is reversed.  Upon remittitur issuance, the trial court is to exercise its discretion whether to impose or strike the prior prison term enhancements (§ 667.5, subd. (b)) as to each of counts 1 and 3 through 6.  The judgment is affirmed in all other respects.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P.J.

I concur:

KRIEGLER, J.

MOSK, J., Concurring

I concur.

In *Neder v. United States* (1999) 527 U.S. 1 (*Neder*), the United States Supreme Court held that a jury instruction that erroneously omits elements of the offense is subject to a harmless error analysis. The harmless error standard is governed in such a case by *Chapman v. California* (1967) 386 U.S. 18. (See *Washington v. Recuenco* (2006) 548 U.S. 212, 213.) Justice Scalia dissented in *Neder* saying, "I believe that depriving a criminal defendant of the right to have the jury determine his guilt of the crime charged—which necessarily means his commission of *every element* of the crime charged—can never be harmless." (*Neder, supra,* 527 U.S. at p. 30.) Although I believe Justice Scalia's point has merit (see also *People v. Flood* (1998) 18 Cal.4th 470, 522 (Mosk, J., dissenting), I am bound to follow the California Supreme Court decision following *Neder*. (See *People v. Aranda* (2012) 55 Cal.4th 342; *People v. Gonzalez* (2012) 54 Cal.4th 643, 663; *People v. Mil* (2012) 53 Cal.4th 400; *People v. Chun* (2009) 45 Cal.4th 1172; *People v. Concha* (2010) 182 Cal.App.4th 1072, 1085-1089.)

I concur in the judgment.


MOSK, J.