Filed 12/11/24  P. v. Lopez CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>VICENTE ERNESTO LOPEZ,<br><br>　　Defendant and Appellant. | G062809<br><br>(Super. Ct. No. 07ZF0008)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Patrick H. Donahue, Judge. Affirmed in part, reversed in part, and remanded.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

In 2005, Vicente Ernesto Lopez was the driver in a gang-related drive-by shooting that left Jason C. seriously injured. He was later convicted of the attempted murders of Jason (count 1) and three other individuals who stood close by at the time of the incident (counts 2–4). In 2022, Lopez petitioned for relief under Penal Code section 1172.6, seeking to have his convictions for attempted murder vacated.[1] After holding an evidentiary hearing, the trial court denied Lopez's petition, concluding he was a direct aider and abettor to the attempted murders. The court's statement of decision indicated it based its conclusion on counts 2 to 4 on a kill-zone theory.[2]

On appeal, Lopez contends the evidence did not support the necessary findings that he knew the shooter intended to kill the alleged victims and that he intended to assist the shooter in doing so. As explained below, we conclude the evidence supported the court's findings as to the attempted murder of Jason. However, we conclude that Lopez cannot be found liable for the attempted murders of the other three individuals under a kill-zone theory—the only theory the court applied. Accordingly, we reverse the court's order in part and remand for further proceedings.

---

[1] Effective June 30, 2022, the Legislature renumbered Penal Code section 1170.95 to section 1172.6 without substantive change. (Stats. 2022, ch. 58, § 10.) For purposes of clarity, we refer to the statute as section 1172.6 throughout this opinion. All statutory references are to the Penal Code.

[2] As discussed further below, the kill-zone theory is a theory for establishing the intent to kill necessary for conviction of attempted murder. (*People v. Canizales* (2019) 7 Cal.5th 591, 607 (*Canizales*).) It applies where the defendant has a primary target and seeks to ensure the death of that person by killing everyone in the area around them. (*Id.* at pp. 607608, fn. 5.) In *Canizales*, our Supreme Court "reaffirmed" the theory "but articulated its contours and limitations." (*People v. Mumin* (2023) 15 Cal.5th 176, 192.)

FACTS

I.

THE INDICTMENT

In 2007, Lopez was indicted for, inter alia, the attempted premeditated and deliberate murders of Jason, E.A., Marcos B., and Jose C. As relevant here, the indictment also charged Lopez with active participation in the Devious Hoodlums (DH) criminal street gang. And it alleged that Lopez committed the attempted murders for the benefit of DH.

II.

THE EVIDENCE AT TRIAL

In early December 2005, someone fired a gun at the residence of Gustavo R. Two days later, Jason was sitting on his bicycle in front of a school in Anaheim, talking with E.A., Marcos, and Jose. Jason and Jose stood side by side, about one foot apart, while E.A. and Marcos stood about four to six feet behind them. Jason was a member of the La Colonia gang, a rival of DH.

At the same time, Lopez was driving in the area with three passengers, Jorge Correa, Victor Tapia, and Andres Garcia. Correa was in the front passenger seat and Tapia and Garcia were in the back passenger seats. After Lopez drove by Jason and the others, Correa said, "'There he is. That is him.'" Lopez made a U-turn and stopped the car in front of Jason and the others. Someone in the car yelled out, "'DH,'" and Correa asked, "'Where are you from?'" Jason replied, "'Colonia,'" while Jose raised his hands and said, "'I don't bang.'" Tapia then pulled out a semiautomatic handgun.

Upon seeing the gun, Jose started running away. Tapia started firing, and Jason ducked to the floor while the others ran. Tapia quickly fired about five shots, striking Jason with one bullet that lodged in his spinal cord.

3

There was no evidence that Tapia hit anyone else. Lopez drove away, let his passengers out at a park, crashed the car into a garage, and left it there, later claiming it had been stolen.

Garcia testified at trial. He admitted to being a gang member and to having participated in "DH gang crime." While he claimed he was surprised by the shooting, he had told police that "'it was for what they did to [Gustavo]'" and that he thought it was part of an initiation of new DH members. According to Garcia, Lopez did not grow up in the area and was not around much, and he had never witnessed Lopez claim DH as his gang.

Anaheim Police Department Sergeant Juan Reveles testified as an expert on criminal street gangs. Reveles explained that when gang members ask, "'Where are you from?'" they are trying to find out what gang the other person is from or to present a challenge to rivals. This is called a "hit-up." Gangs expect their members to claim their gang in response to a hit-up.

According to Reveles, gang crimes, or "missions," are typically undertaken in groups because each gang member serves a different function in committing the crime. In a drive-by shooting, the shooter and the driver are the two most important roles. In Reveles's experience, gang members would not take non-members to commit a gang crime. As for a gang's guns, they are the gang's "prized possession[s]," and members are aware of where the guns are and "whether somebody has them."

III.

JURY INSTRUCTIONS, VERDICT, AND SENTENCE

At the conclusion of trial, the trial court instructed the jury on attempted murder principles, including the kill-zone theory. The court also instructed the jury on principles of direct aiding and abetting and the natural

4

and probable consequences doctrine. As relevant here, the jury found Lopez guilty of all four counts of attempted murder. The jury found that the attempted murders were premeditated and deliberate and were committed for the benefit of a criminal street gang. It also convicted Lopez of active participation in a criminal street gang.

The trial court sentenced Lopez to 45 years to life in state prison. We affirmed the judgment on direct appeal. (*People v. Lopez* (May 18, 2010, G041006) [nonpub. opn.].)

IV.

LOPEZ'S SECTION 1172.6 PETITION

In 2022, Lopez filed a petition for relief under section 1172.6. After appointing counsel for Lopez and receiving briefing, the trial court issued an order to show cause and set the matter for an evidentiary hearing.

At the hearing, the prosecution offered the transcripts from Lopez's trial into evidence and relied on them exclusively. Lopez testified on his own behalf. He claimed that he had never heard about DH before he was arrested for the attempted murders. On the day of the shooting, he was driving with Correa, Tapia, and Garcia to get some marijuana. He knew the three men because he would occasionally smoke marijuana with them, but they had never told him they were gang members. He also did not know there was a gun in the car. At some point during the drive, someone in the car told him to make a U-turn. Lopez complied, and either Tapia or Garcia told him to pull over because they had to ask somebody something. He stopped the vehicle, and "[s]omebody in the backseat started shooting somebody." Lopez did not hear anyone outside the car say anything.

5

Lopez acknowledged that he knew Gustavo because he had gotten arrested with him earlier in 2005, the year of the shooting. He had also smoked marijuana with Gustavo at Gustavo's house before.

At the close of the hearing, Lopez's counsel argued, inter alia, that the evidence was insufficient to convict Lopez of some of the attempted murders under a kill-zone theory. Counsel cited *Canizales, supra*, 7 Cal.5th 591, and argued that this precedent "narrow[ed] the focus" of the kill-zone analysis. He noted that at trial, the jury was permitted to apply the kill-zone theory together with the natural and probable consequences doctrine and emphasized that under current law: "[w]e can't have a conviction for an attempted murder based on natural and probable consequence on top of a kill zone. There has to have been on Mr. Lopez's part an intent to kill."

The prosecution requested time to brief the issue and later submitted a supplemental brief. In its brief, the prosecution agreed that *Canizales* "considerably narrowed" the application of the kill-zone theory and stated that its changes were reflected in the current version of the standard jury instruction on attempted murder, CALCRIM No. 600. It contended that Tapia's actions satisfied *Canizales* and "complie[d] with the new language in CALCRIM [No.] 600." The prosecution therefore asserted: "[Lopez] is ineligible for resentencing as the evidence demonstrates beyond a reasonable doubt [that] he is guilty of [Jason's] attempted murder . . . as an aider and abettor under the current law. Additionally, he remains guilty of [the] attempted murder[s] [of E.A., Marcos, and Jose] because he aided and abetted Tapia's shooting which resulted in a kill zone."

6

## V.

### THE TRIAL COURT'S RULING

Following the hearing, the trial court denied Lopez's petition. In its written statement of decision, the court outlined the general principles governing the crime of attempted murder and aider-and-abettor liability under current California law. After surveying the evidence presented at trial, the court found:

> ". . . Lopez knew that he was with 'DH' gang members who were going to retaliate for the shooting at [Gustavo]'s house. . . . Further, Lopez was trusted by the gang members in the car on this mission, and knew that there was a gun in the car. [¶] . . . [¶] An independent review of the evidence shows that Tapia, when he shot five times into the compact group of [Jason] and his three friends, he intended to kill them beyond a reasonable doubt. The evidence further shows beyond a reasonable doubt that Defendant Lopez knew that Correa would hit up the victim, made a [U]-turn to allow Correa to do so, then with knowledge that Tapia had a gun, stayed at the curb to allow Tapia to . . . shoot five times. [¶] There is proof beyond a reasonable doubt that Defendant Lopez aided and abetted Tapia in this attempt murder. . . .

> "It was argued that the court should rule on whether the evidence presented would suggest a conviction beyond a reasonable doubt based on new CALCRIM [No.] 600 instruction. [¶] . . . The evidence shows that the only conclusion from the use of lethal force was that Tapia intended to create a kill zone around Jason . . . , the La Colonia gang member. Tapia was only feet away from Jason['s] . . . group. The members were only feet from each other. From that close distance, Tapia fired five shots from a semiautomatic handgun, creating a kill zone and the four members of the group were in the kill zone."

7

The trial court proceeded to address Lopez's testimony at the evidentiary hearing and concluded his version was neither credible nor reasonable. Lopez timely appealed the denial of his petition.

DISCUSSION

Lopez argues the trial court erred by denying his section 1172.6 petition because the evidence did not support the findings that he knew Tapia intended to kill the alleged victims and that he intended to assist him in doing so. As explained below, we conclude the evidence supported the court's findings as to the attempted murder of Jason. However, we conclude that Lopez cannot be found liable for the attempted murders of the other three individuals under a kill-zone theory, the only theory the court applied.

I.

GOVERNING LAW

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Superior Court* (*Decker*) (2007) 41 Cal.4th 1, 7.) Until recently, an aider and abettor could be found guilty of attempted murder based on their participation in a different target crime, if attempted murder was the natural and probable consequence of the target crime. (*People v. Rodriguez* (2024) 103 Cal.App.5th 451, 456.) The Legislature has recently eliminated the natural and probable consequences theory of attempted murder liability. Effective January 1, 2022, a defendant convicted of attempted murder under a theory of natural and probable consequences may petition to have the conviction vacated. (§ 1172.6, subd. (a); as amended by Stats. 2021, ch. 551, § 2.)

If the petition states a prima facie case for relief, the trial court must issue an order to show cause and hold a hearing to determine whether

8

to vacate the conviction. (§ 1172.6, subds. (c), (d)(1).) At that hearing, the prosecution has the burden to prove beyond a reasonable doubt that the defendant is guilty of attempted murder under current law. (§ 1172.6, subd. (d)(3).) The prosecution therefore must prove that the defendant personally harbored an intent to kill. (*People v. Das* (2023) 96 Cal.App.5th 954, 960.) And if the prosecution contends the defendant is guilty as an aider and abettor, it must also prove that the defendant "'aid[ed] the commission of th[e] offense with "knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends."' [Citation.]" (*People v. Curiel* (2023) 15 Cal.5th 433, 463.)

We review the trial court's denial of a section 1172.6 petition after an evidentiary hearing for substantial evidence. (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).) Under this standard, "we view the evidence in the light most favorable to the [ruling] and determine whether *any* rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. [Citations.]" (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.) "We presume in support of the [order] the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

II.

ATTEMPTED MURDER OF JASON

The evidence sufficiently supported the trial court's findings that Lopez (1) knew Tapia intended to kill Jason and (2) intended to assist him in doing so. Initially, contrary to Lopez's assertion, the evidence supported the

9

finding that he was an active DH gang member.[3] On the day of the shooting, he was driving with three members of the gang: Garcia, a self-admitted member; Correa, who issued the gang challenge; and Tapia, who performed the gang shooting. And Reveles testified that gang members typically would not take non-members to commit a gang crime.

The evidence also supported findings that Lopez and his fellow gang members were on a DH mission. Garcia told police he believed the shooting was done as retaliation for the shooting at Gustavo's house and as initiation for new gang members.[4] When Lopez drove by Jason and the other alleged victims, Correa said, "There he is. That is him," suggesting he had identified a person who had been involved in the shooting at Gustavo's house or, at least, was a good target for retaliation.

As the driver, Lopez had one of the two most important roles in the mission. Based on Reveles's testimony that gang members know when someone is carrying one of the gang's guns, it was logical to conclude that Lopez knew Tapia had a gun. After Correa's sighting, Lopez made a U-turn and stopped the car in front of Jason and the others, positioning Correa to initiate the confrontation and Tapia to perform the shooting. Before the shooting began, Jason identified himself as a member of a rival gang. Tapia

---

[3] Although the jury found that Lopez was an active participant in a criminal street gang, the Attorney General does not contend that this finding precluded Lopez from challenging the sufficiency of the evidence on this point. We therefore do not consider this finding and instead rely on the state of the evidence to reject Lopez's argument.

[4] Lopez contends there was no evidence that he knew about the shooting at Gustavo's house. But based on his gang membership, his role in what Garcia said was a retaliation mission, and his close familiarity with Gustavo, it was reasonable to infer that he knew about the incident.

responded by firing about five shots, hitting Jason and lodging a bullet in his spinal cord.

Thus, the evidence showed that Lopez: (1) was an active DH gang member; (2) had an important role in a mission to retaliate against a rival; (3) knew that Tapia had a gun; and (4) upon acquiring a target, positioned his fellow members to initiate a confrontation, verify the target's identity as a rival, and shoot him. Under these circumstances, the trial court permissibly found that Lopez knew Tapia would attempt to kill Jason and intended to assist him in doing so.[5] Accordingly, the court did not err in denying Lopez's petition as to his conviction for the attempted murder of Jason.

## III.

### ATTEMPTED MURDERS OF E.A., MARCOS, AND JOSE

*A. Kill-zone Principles*

The kill-zone theory is a "theory for establishing the specific intent to kill required for conviction of attempted murder." (*Canizales, supra,* 7 Cal.5th at p. 607.) "'[I]n a kill zone case, the defendant has a primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located.'" (*Ibid.*) Thus, to convict a defendant under the kill-zone theory, the trier of fact must find that the "defendant intended to kill everyone in the kill zone as a means of killing the primary target." (*Id.* at pp. 607–608, fn. 5.) "[T]he kill zone theory does not apply

---

[5] *People v. Ware*, (2022) 14 Cal.5th 151, cited by Lopez, is inapposite. There, our Supreme Court concluded that the defendant's "membership in a group with violent aims and his association with individuals who commit violent crimes" is insufficient to support a finding that he specifically intended to commit murder or to enter an agreement to commit murder. (*Id.* at p. 174.) By contrast, the evidence discussed above ties Lopez's conduct and mental state to the relevant crime and does not merely concern his membership in a gang.

11

where 'the defendant merely subjected persons near the primary target to lethal risk.'" (*Ibid.*)

"[M]ultiple factors bear on whether the circumstances of the attack sufficiently show a defendant intended to create a kill zone around a primary target." (*People v. Mumin, supra*, 15 Cal.5th at p. 193.) These include the weapon used, the number of shots fired (if a firearm is used), the distance between the defendant and the alleged victims, the proximity of the alleged victims to the primary target, and whether an alleged secondary target was injured. (*Id.* at pp. 193, 205.) "The far more commonplace act of firing one or a few shots at a group may supply the actus reus for a number of crimes. But, standing alone, it does not support a conclusion that the shooter intended to create a kill zone around the primary target in order to ensure that primary target will die. [Citation.]" (*Id.* at p. 193.)

*B. Analysis*

We conclude Lopez cannot be found liable for the attempted murders of the E.A., Marcos, and Jose under a kill-zone theory. The evidence does not support findings that Lopez (1) knew Tapia intended to create a kill-zone to ensure Jason's death and (2) intended to help him do so.

Initially, the Attorney General asserts that the trial court addressed the kill-zone theory merely as an alternative theory after finding that Lopez acted with a separate intent to kill each of the alleged victims. We disagree. Below, the parties' arguments on counts 2 to 4 focused on the application of the kill-zone theory. As noted, while the prosecution argued that Lopez was guilty of Jason's attempted murder simply "as an aider and abettor," it contended he was guilty of the attempted murders of E.A., Marcos, and Jose "because he aided and abetted Tapia's shooting *which*

*resulted in a kill zone*." (Italics added.) In doing so, it stated that the evidence complied with the current version of CALCRIM No. 600.

The trial court's analysis followed suit. After saying that Tapia intended to kill "[Jason] and his three friends," the court referenced the new version of CALCRIM No. 600, alluding to the parties' arguments about the kill-zone theory. It stated that "the only conclusion from [Tapia's] use of lethal force was that Tapia intended to create a kill zone around Jason . . . , the La Colonia gang member." The court included no other meaningful discussion of either Tapia's or Lopez's intent to kill E.A., Marcos, and Jose. Thus, the court's statement of decision indicates that it relied exclusively on the kill-zone theory to establish Tapia's and Lopez's intent to kill these three alleged victims.

Turning to the merits of the trial court's analysis, even assuming Tapia attempted to create a kill zone around Jason, there is no basis for a finding that *Lopez* was aware of Tapia's intent and intended to assist him in achieving that goal, as necessary for his conviction as an aider and abettor.[6]

---

[6] Whether the evidence supported a finding that Tapia intended to create a kill zone around Jason is, at least, subject to reasonable dispute: though he fired at close range and the group was initially close together, he fired only about five shots, at an open space, hitting only his intended target. (See *People v. Mumin, supra*, 15 Cal.5th at pp. 193, 204205 [finding evidence insufficient to support kill-zone theory, in part because defendant fired only three shots, into open area, hitting neither primary target nor alleged secondary target].) Moreover, while Jason ducked when Tapia started shooting, the others ran away. In fact, Jose started running when he saw the gun, before Tapia started firing. This suggests the group was no longer close together when Tapia was firing. But we need not consider whether the evidence supported application of the kill-zone theory to Tapia's conduct or whether Lopez may even raise that issue in his section 1172.6 petition because, regardless of Tapia's intent, the evidence was insufficient to prove *Lopez*'s required mental state under this theory.

13

(*People v. Curiel, supra*, 15 Cal.5th at p. 463.) The record reflects no common plan to kill everyone in order to ensure Jason's death. There was no evidence that any discussion took place about the need to kill everyone around the target Correa had identified. Nor was there expert testimony suggesting that gangs typically used kill zones to ensure the death of a single target, either generally or under the circumstances of this case. In short, there was nothing tying Lopez to any attempt by Tapia to create a kill zone.

The statement of decision did not address this issue—it discussed only Tapia's actions and did not analyze how they related to Lopez's state of mind.[7] The Attorney General does the same in his brief and offers no discussion of evidence that could establish Lopez's mental state under a kill-zone theory. Because there was no evidence that Lopez intended to create a kill zone around Jason, he could not be found liable for the attempted murders of E.A., Marcos, and Jose under a kill-zone theory—the only theory the trial court considered. Accordingly, we must reverse the court's ruling as to those counts and remand for further proceedings.

Like the trial court, Lopez does not address the theory that he separately intended to kill all four individuals and intended to help Tapia do so. We therefore do not decide whether the evidence was sufficient to support Lopez's liability under this theory for the attempted murders of E.A., Marcos, and Jose. The trial court may consider this theory on remand.

---

[7] As the Attorney General notes, the trial court was aware that attempted murder liability required a finding that Lopez himself intended to kill the alleged victims. Yet the absence of an explicit finding and explanation by the court underscores the lack of evidentiary support for applying the kill-zone theory to Lopez.

14

## DISPOSITION

The trial court's denial of Lopez's petition as to count 1 is affirmed. The court's denial of the petition as to counts 2 to 4 is reversed, and the matter is remanded for further proceedings consistent with this opinion.


O'LEARY, P. J.

WE CONCUR:


GOETHALS, J.


MOTOIKE, J.